Susan WEINSTEIN, et al., Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al., Defendants.

No. CIV.A.00–2601 RCL.

United States District Court, District of Columbia.

July 22, 2003.

William A. Davis, Mintz, Levin, Cohn, Ferris, Washington, DC, Jeffrey A. Miller, Westerman Ball Ederer Miller & Sharstein, LLP, Mineola, NY, for Plaintiff.

Carol Federighi, U.S. Department Of Justice Civil Division, Washington, DC, Rupa Bhattacharyya, Federal Programs Branch Civil Division, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

LAMBERTH, District Judge.

This matter comes before the Court on the motion of the United States to quash plaintiffs' writs of attachment [40–1], which was filed on January 31, 2003. Upon consideration of the United States's motion, plaintiffs' brief in opposition thereto, the reply brief of the United States, and the applicable law in this case, the Court finds that the United States's motion to quash should be granted in part and denied in part.

### I. PROCEDURAL BACKGROUND

On February 25, 1996, Ira Weinstein, an American citizen, was injured in a suicide bombing undertaken by members of Hamas in Jerusalem, and died on April 13 of that year. Plaintiffs initiated the present suit on October 27, 2000 under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605, as amended.

On February 6, 2002, this Court entered a default judgment against defendants, and awarded plaintiffs $33.2 million in compensatory damages and $150 million in punitive damages. *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C.2002). Plaintiffs' counsel later served three writs of attachment, which are dated November 26, 2002, upon the U.S. Departments of State, Defense, and Treasury. The writs notified these agencies that "any money, property or credits other than wages, salary and commissions of the above named defendant(s), are seized ... and you are required to hold it and not to pay or surrender it to the defendant(s) or to anyone else without an order from this court." The cover letters transmitted with the writs noted that the writs "appl[y], *inter alia* and *without limitation*, to the Iran Foreign Military Sales Program account within the Foreign Military Sales ('FMS') Fund and to any other assets, credits or funds of the instant judgment debtors and their agencies and instrumentalities within the FMS Fund," as well as to four identified Bank of America accounts "if the funds in any of these accounts are found to be funds of the instant judgment debtors or their agencies and instrumentalities held by the United States."

On January 31, 2003, the United States filed a motion with this Court seeking to quash the three writs of attachment issued against the Departments of State, Treasury, and Defense.[1] Plaintiffs submitted a brief in opposition to the United States's motion on May 9, 2003. The reply brief of the United States was filed on June 13, 2003.

### II. ANALYSIS

Before analyzing the legal questions at issue, it will be necessary to explain the precise scope of the issues before the Court. In their opposition brief, plaintiffs have clarified that the writs of attachment

---

1. The United States appears pursuant to 28 U.S.C. § 517, which authorizes the United States to appear in any court in the United States "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

served upon the Departments of Defense, State, and Treasury were not directed towards any Iranian diplomatic or consular real properties located in the United States. The reply brief of the United States appears to accept this representation of plaintiffs. Therefore, the issue of whether the writs of attachment could reach such properties is not before this Court. Instead, the only assets that plaintiffs are seeking to attach are the four Bank of America accounts identified in the attachment writs ("the Bank of America accounts") and the Iran Foreign Military Sales Program account within the Foreign Military Sales Fund ("the FMS account").

The United States asserts that the writs should be quashed because the doctrine of federal sovereign immunity bars the attachment of the assets sought in the writs. Plaintiffs acknowledge that this doctrine is implicated, but contend that the United States has waived its sovereign immunity with respect to the attachment of these assets. Because the question of whether a valid waiver of sovereign immunity exists constitutes a threshold jurisdictional question, the Court will address this issue first.

### A. Federal Sovereign Immunity

■ The doctrine of federal sovereign immunity provides that the United States may not be sued without its express consent. Therefore, absent an express waiver of sovereign immunity, the federal government and its agencies will be immune from suit. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999). A waiver of sovereign immunity must be "unequivocally expressed in the statutory text" and "is to be strictly construed, in terms of its scope, in favor of the sovereign." *Id.* at 261, 119 S.Ct. 687. Therefore, any ambiguities within the statutory text must be resolved in favor of the sovereign. *See United*

*States v. Williams*, 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995) ("Our task is to discern the unequivocally expressed intent of Congress, construing ambiguities in favor of immunity.") (citation and internal quotation marks omitted).

■ This Court has previously explained that the principles of sovereign immunity "apply with equal force to attachments and garnishments." *Flatow v. Islamic Republic of Iran*, 74 F.Supp.2d 18, 21 (D.D.C.1999) (citations omitted). Therefore, if a litigant seeks to attach funds held in the U.S. Treasury, he or she must demonstrate that the United States has waived its sovereign immunity with respect to those funds. *Id.* at 22 (concluding that U.S. Treasury funds constituted the property of the United States and could not be attached in the absence of an express waiver of sovereign immunity).

In the instant case, plaintiffs assert that section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub.L. No. 107–297, 116 Stat. 2322 (2002) functions as an express waiver of sovereign immunity, allowing them to attach funds held by the United States. Whether, in fact, the TRIA constitutes a waiver of federal sovereign immunity appears to be an issue of first impression. The Court must therefore examine the statutory language, in order to determine whether it demonstrates a clear, unequivocal expression of intent to waive the sovereign immunity of the United States.

Section 201(a) of the TRIA provides:
IN GENERAL.—Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of

that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.   .

The term "blocked assets" is defined in section 201(d)(2) as

any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

(B) does not include property that—

(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) or the United Nations Participation Act of 1945 (22 U.S.C. 287 *et seq.*); or

(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

Plaintiffs assert that by mandating that "the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy such judgment," Congress expressly waived the sovereign immunity of the United States with respect to "any asset seized or frozen by the United States" under the two identified statutes that does not fall under the protection of subsection (B). They construe the phrase "any asset . . . seized by the United States" to refer to assets that have been seized by the United States, and are presently being held by the United States. Therefore, plaintiffs explain, Congress has waived the sovereign immunity of the United States with respect to writs seeking to attach any assets seized by the United States from a "terrorist party," as defined in the statute, and that are currently being held by the United States.

However, the phrase in question is by no means susceptible to only one interpretation. As the United States points out, it is a mistake to equate "assets seized by" (which refers to assets of which the United States has taken forcible possession) with "assets held by" (which refers to assets presently possessed by the United States by a lawful title). For example, the United States might have seized assets from a foreign state sponsor of terrorism at some point in time, but later decided to relinquish its possession of those assets. In such an instance, although the assets would have been "assets seized by" the United States, they are not "assets (presently) held by" the United States. In other words, the intent of Congress may simply have been to authorize successful plaintiffs to attach assets that have previously been seized by the United States from state sponsors of terrorism, and that are no longer being held by the United States. This interpretation also makes sense in light of the precise phrase in question: "any asset seized or frozen by the United States." Assets that have been frozen by the United States are not necessarily assets that are held by the United States, because the frozen assets might belong to some other entity.

■ In short, the language of section 201 is susceptible to two meanings, one providing for a waiver of federal sovereign immunity and one that does not provide a waiver of sovereign immunity. As such, this Court cannot conclude that it constitutes a clear, unequivocal waiver of federal sovereign immunity. *See Galvan v. Fed. Prison Indus.*, 199 F.3d 461, 464 (D.C.Cir. 1999) ("So long as a statute supposedly waiving immunity has a 'plausible' non-waiver reading, a finding of waiver must be rejected.") (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)).

■ It follows that if the property sought to be attached by plaintiffs is property that (1) has been seized by the United States from a terrorist party and (2) is presently held by the United States, it cannot be attached by their three writs. The Court must therefore examine the assets sought to be attached in order to determine whether they satisfy these two requirements.

### B. The FMS Account

■ Under the Foreign Military Sales Program, the United States sells military equipment and services to foreign nations and international organizations. The program is governed by the Arms Export Control Act of 1976, which is codified at 22 U.S.C. §§ 2751 *et seq.* Payments to the United States from the participants in the program are deposited into a single account in the U.S. Treasury known as the FMS Account. Plaintiffs seek to attach the portion of the FMS Account attributable to moneys that are to be disbursed to Iran. It is undisputed that this account represents a fund held by the U.S. Treasury. As this Court has observed, "funds held in the U.S. Treasury—even though set aside or 'earmarked' for a specific purpose—remain the property of the United States until the government elects to pay them to whom they are owed." *Flatow*, 74 F.Supp.2d at 21 (citing *Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 11 L.Ed. 857 (1846)). Therefore, the doctrine of federal sovereign immunity bars the attachment of the FMS Account, or any portion thereof, by plaintiffs.

### C. The Bank of America Accounts

Plaintiffs also seek to attach four identified Bank of America accounts "if the funds in any of these accounts are found to be funds of the instant judgment debtors or their agencies and instrumentalities held by the United States." Each of these accounts is related in some way to real property located in the United States that was formerly used by the Iranian government for diplomatic or consular purposes. Because the accounts vary in their nature and purpose, it will be necessary for the Court to analyze them separately. However, the Court will provide a brief description of how these accounts came into being.

On November 14, 1979, pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, and other authorities, President Carter issued Executive Order 12170, which blocked all Iranian assets subject to the jurisdiction of the United States. However, in accordance with the Vienna Conventions on Diplomatic and Consular Relations, the United States allowed Iran to continue to occupy its embassy and other diplomatic residences within the United States. On April 7, 1980, the president announced that the United States was breaking diplomatic relations with the government of Iran. The Secretary of State informed the Iranian government that its embassy and consulates in the United States were to be closed, and that all Iranian diplomatic and

consular officials were to leave the country by the next day.

### 1. The Rental Proceeds Accounts

Two of the Bank of America accounts (the "First and Second Accounts") relate to real property in the United States that formerly served as sites of embassies or consular offices of the nation of Iran. These former Iranian diplomatic properties are presently being leased by the United States to third parties. The monies generated by these leases are placed in the Second Account for immediate disbursal to be used to pay for maintenance and repair expenses of the properties. Any funds generated from these leases that exceed the expected cost of maintenance and repairs are transferred to the First Account on a yearly basis.

■ The First Account is entitled "Iranian Diplomatic and Consular Property Renovation Account." In another proceeding, this Court determined that this account constituted "United States property, which is immune from attachment by virtue of the doctrine of sovereign immunity." *Flatow v. Islamic Republic of Iran,* 76 F.Supp.2d 16, 24 (D.D.C.1999). Although the United States suggests in its motion to quash that the property might be more properly characterized as the property of Iran, the doctrine of collateral estoppel prevents reconsideration of this issue. Therefore, because this account represents funds held by the United States, it is barred from attachment by plaintiffs on the grounds of federal sovereign immunity.

The Second Account is entitled "U.S. Department of State, Office of Foreign Missions, Iranian Renovation Account." Although the Second Account was also discussed in *Flatow,* the Court made no determination as to whether it represented the property of the United States. *See id.*

■ A portion of the funds in the Second Account has been designated under the Victims of Trafficking and Violence Protection Act of 2000 to be paid to certain persons who have obtained judgments under the FSIA against Iran. *See* Victims of Trafficking and Violence Protection Act of 2000 ("the Act"), Pub.L. No. 106–386, § 2002(b)(2), 114 Stat. 1464, 1542 (directing the Treasury Secretary to make payments to the designated persons "from amounts paid and liquidated from … rental proceeds accrued on the date of the enactment of this Act from Iranian diplomatic and consular property located in the United States"). Although section 201(b) of the TRIA amended the Act, it made no changes to the language of this subsection. The portion of the funds in the Second Account that are thus designated for payments to prevailing FSIA plaintiffs will therefore be unavailable for attachment by the plaintiffs in the present action. It does not appear that this will result in prejudice to plaintiffs, however, because the United States represents that plaintiffs are eligible to be designated by the Secretary of the Treasury to receive payment from these funds in the Second Account.

However, the United States does not represent that the entirety of the Second Account has been designated to satisfy these judgments against Iran. Therefore, the Court must determine whether plaintiffs may attach the portion of the Second Account that has not been so designated.

The United States asserts that plaintiffs may not attach this portion of the Second Account because the Second Account does not fall under the definition of "blocked assets" under the TRIA. As noted above, the TRIA excludes from its definition of "blocked assets" that may be attached by prevailing FSIA plaintiffs "property that … in the case of property subject to the

Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes." In turn, "property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" is defined as "any property ..., the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be." Article 45 of the Vienna Convention on Diplomatic Relations provides, in relevant part, that "[i]f diplomatic relations are broken off between two States, or if a mission is permanently or temporarily recalled ... the receiving State must, even in case of armed conflict, respect and protect the premises of the mission, together with its property and archives[.]" Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502, *available at http://www.un.org/law/ilc/texts/diplomat.htm.* Article 27 of the Vienna Convention on Consular Relations includes a parallel provision: "In the event of the severance of consular relations between two States ... the receiving State shall, even in case of armed conflict, respect and protect the consular premises, together with the property of the consular post and the consular archives[.]" Vienna Convention on Consular Relations, 21 U.S.T. 77, T.I.A.S. No. 6820, *available at http://www.un.org/law/ilc/convents.htm.*

The United States asserts that because the funds in the Second Account are being used only to pay for maintenance and repair expenses of the former Iranian diplomatic properties, they constitute property "being used exclusively for diplomatic and consular purposes." Specifically, it explains that the funds are presently being used to fulfill the obligation of the United States under the two Vienna conventions to protect and maintain the former diplomatic properties. Plaintiffs, on the other hand, insist that the term "being used exclusively for diplomatic or consular purposes" should not be construed to refer to funds that are being used to maintain and repair properties that were *formerly* used for diplomatic purposes.

None of the case law cited by plaintiffs or the United States definitely resolves this issue. It is true that in *Liberian Eastern Timber Corp. v. Government of Republic of Liberia,* 659 F.Supp. 606 (D.D.C.1987), another court in this circuit concluded that bank accounts used by the Liberian Embassy were immune from attachment under the Vienna Convention on Diplomatic Relations. But that case involved a functional embassy, not one that had long since been abandoned. More recently, in *Hill v. Republic of Iraq,* 2003 WL 21057173 (D.D.C. March 11, 2003), another court in this circuit ordered that bank accounts held in the name of the former Iraqi embassy in the United States be attached under the TRIA. But the court concluded that the funds in these accounts "were used primarily (if not exclusively) for commercial, rather than diplomatic, purposes." *Id.* at n. 4.

■ The Court concludes that the more logical argument is that the funds in question fit within the TRIA's definition of property that is "being used exclusively for diplomatic and consular purposes." The sole purpose of the funds in the Second Account is to maintain and repair the former Iranian diplomatic residences within the United States, in accordance with the United States's obligation under both of the Vienna conventions to "respect and protect" the buildings that once constitut-

ed these residences. If the Court permitted plaintiffs to attach these funds, the United States would thereby be deprived of the funds that it utilizes to satisfy this obligation. Therefore, such an attachment would result in a violation of an obligation owed by the United States pursuant to the two conventions. The Court therefore finds that the funds in the Second Account that have not been designated to satisfy judgments pursuant to the Victims of Trafficking and Violence Protection Act are nevertheless not subject to attachment because they do not constitute "blocked assets" under the TRIA.

### 2. The Third and Fourth Accounts

On November 16, 1979, two days after President Carter issued Executive Order 12170 freezing all Iranian assets in the United States, the Treasury Department issued a directive to the Continental Illinois National Bank & Trust: "You are hereby authorized to permit the [Iranian] Consulate General (Chicago) to operate the following checking account with you . . . . You are authorized to make all payments, transfers and withdrawals from and credits to said account, which is necessary for use by such office for its lawful official operations in the United States." On November 19, 1979, the Treasury Department issued a directive to Bank of America similar to the November 16 directive sent to the Continental Illinois National Bank & Trust. The directive authorized the bank to permit the Iranian Consulate General in San Francisco to operate two checking accounts with the bank. As noted above, however, all Iranian embassies and consulates within the United States were closed on April 8, 1980, and all Iranian diplomatic and consular officials were ordered to leave the country by midnight on that date. Some time afterward, Bank of America acquired the Continental Illinois National Bank & Trust.

The Third Account is the checking account that had been used by the Iranian consulate in Chicago, which is entitled "Consulate General of the Islamic Republic in Chicago." The two checking accounts used by the Iranian consulate in San Francisco were combined to form the Fourth Account, which is entitled "Consulate General Iran." The United States claims that despite the fact that these accounts have "presumably [become] inactive (as the signatories on the accounts [have] left the country," they may not be attached by plaintiffs because they constitute property that the United States is obliged to protect under the Vienna conventions.) The Court disagrees. The United States cites no specific provision of the Vienna conventions indicating that the United States is obliged to protect these funds, and the Court has been unable to locate such a provision. Under the Vienna Convention on Diplomatic Relations, the United States is only obliged to protect "the premises of the mission," which is defined under Article 1 of the convention as "the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission." Similarly, under the Vienna Convention on Consular Relations, the United States is only obliged to protect "consular premises," which is defined under Article 1 as "the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used exclusively for the purposes of the consular post." Therefore, the only property that the United States is obliged to "respect and protect" under the conventions is "the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used exclusively for" diplomatic or consular purposes. The accounts in question manifestly do not fit within this definition. Moreover, unlike the Second

Account, the Third and Fourth Accounts are not presently being used for any diplomatic or consular purpose, such as to maintain and repair the former Iranian embassies. Finally, the United States does not allege, and this Court does not find, that the accounts were "subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute," pursuant to section 201(d)(2)(B)(i) of the TRIA. Therefore, plaintiffs may attach the Third and Fourth Accounts.

## III. CONCLUSION

The Court concludes that section 201 of the Terrorism Risk Insurance Act does not provide an express waiver of federal sovereign immunity. Therefore, the FMS Account and the First Account, which are the property of the United States, cannot be attached by plaintiffs to satisfy their judgment against Iran. Additionally, the Second Account does not constitute "blocked assets" subject to attachment under the TRIA. However, the Third and Fourth Accounts are subject to attachment by plaintiffs. It is therefore

ORDERED that the motion of the United States to quash plaintiffs' writs of attachment [40–1] be, and hereby is, GRANTED in part and DENIED in part. It is further

ORDERED that plaintiffs' writs of attachment be, and hereby are, QUASHED as to the Iran Foreign Military Sales Program account within the Foreign Military Sales Fund, and the two Bank of America accounts entitled "Iranian Diplomatic and Consular Property Renovation Account" and "U.S. Department of State, Office of Foreign Missions, Iranian Renovation Ac-

count," which are referred to herein as the First and Second Accounts. It is further

ORDERED that the motion of the United States to quash plaintiffs' writs of attachment be, and hereby is, DENIED as to the two Bank of America accounts entitled "Consulate General of the Islamic Republic in Chicago" and "Consulate General Iran," which are referred to herein as the Third and Fourth Accounts.

SO ORDERED.