# United States Court of Appeals
## For the First Circuit

No. 11-2144

JENNY RUBIN, ET AL.,

Plaintiffs, Appellants,

v.

ISLAMIC REPUBLIC OF IRAN, ET AL.,

Defendants,

HARVARD UNIVERSITY, ET AL.,

Trustees, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Howard, Stahl, and Lipez,
Circuit Judges.

Meir Katz, with whom Robert J. Tolchin and The Berkman Law
Office, LLC were on brief, for appellants.
Paul R.Q. Wolfson, with whom Mark C. Fleming, Sydenham B.
Alexander, III, Shirley X. Li Cantin, Janet R. Carter, and Wilmer
Cutler Pickering Hale and Dorr LLP were on brief, for appellee
Harvard University.

Simon J. Frankel, with whom Covington & Burling LLP, Robert J. Muldoon, Jr., Thomas Paul Gorman, and Sherin and Lodgen LLP were on brief, for appellee Museum of Fine Arts, Boston.

Benjamin M. Shultz, with whom Mark B. Stern and Sharon Swingle, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, Stuart F. Delery, Acting Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Matthew Tuchband, Acting Chief Counsel, Office of Foreign Assets Control, U.S. Department of the Treasury, and Harold Hongju Koh, Legal Advisor, U.S. Department of State, were on brief, for amicus curiae United States.

———————————

February 27, 2013

———————————

**STAHL, Circuit Judge.** The plaintiffs-appellants in this case are United States citizens who were injured in a 1997 terrorist attack that Hamas orchestrated in Jerusalem. They sued the Islamic Republic of Iran in the United States District Court for the District of Columbia, alleging that Iran had provided material support to Hamas and was therefore liable for the attack. In 2003, the plaintiffs obtained a default judgment against Iran. Campuzano v. Islamic Rep. of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003). Seeking to collect on that judgment, they moved to attach, by trustee process action in the District of Massachusetts, certain antiquities that they claim are the property of Iran but that are currently in the possession of the defendants-appellees, the Museum of Fine Arts, Boston (MFA) and Harvard University (collectively, "the Museums").

After several years of litigation, the district court granted the Museums' motions to dissolve the attachments, concluding that the Museums could invoke the objects' immunity from attachment under the Foreign Sovereign Immunities Act, and that although the Terrorism Risk Insurance Act provided a potential way around that immunity, the plaintiffs had failed to meet their burden of proving that the antiquities in question were attachable under that statute. We agree with the district court that the trustee attachments should be dissolved, though we take a narrower path to reach that conclusion.

-3-

## I. Facts & Background

This action began in 2005, when the plaintiffs registered their default judgment against Iran[1] in the District of Massachusetts and moved for orders of attachment by trustee process against all "antiquities . . . that are the property of the Islamic Republic of Iran" in the possession of the Museums. See Fed. R. Civ. P. 69. At issue are approximately 500 objects in Harvard's possession and approximately 1,485 objects held by the MFA that originated in or near the area covered by the current borders of Iran, including stone reliefs, sculptures, and archaeological specimens.

The Museums moved to quash the trustee process summonses and dissolve the attachments, arguing that Iran did not own the antiquities and that, even if it did, the antiquities would be immune under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611, which provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter," id. § 1609.

The plaintiffs responded with three arguments, raised in a motion for partial summary judgment and an opposition to the

---

[1] In the District of Columbia action, the plaintiffs sued Iran and other defendants. The plaintiffs were awarded $71.5 million in compensatory damages against all defendants and $37.5 million each in punitive damages against all defendants except Iran. Rubin v. Islamic Rep. of Iran, 456 F. Supp. 2d 228, 230 (D. Mass. 2006).

motion to quash: (1) the Museums did not have standing to assert sovereign immunity on behalf of Iran; (2) even if they did, the "commercial use" exception to immunity under the FSIA would apply, see id. § 1610(a)(7); and (3) in any event, the plaintiffs could reach the antiquities under section 201(a) of the Terrorism Risk Insurance Act of 2002 (TRIA), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002) (codified at 28 U.S.C. § 1610 note), which permits the attachment of certain "blocked assets of [a] terrorist party." The district court found it appropriate to consider whether the antiquities were immune under the FSIA and determined that the "commercial use" exception did not apply, but concluded that the plaintiffs might still be able to attach the antiquities under section 201(a) of TRIA if they could prove that the antiquities belonged to Iran. Rubin v. Islamic Rep. of Iran (Rubin I), 456 F. Supp. 2d 228 (D. Mass. 2006).

The Museums moved for reconsideration of the district court's ruling that the antiquities qualified as "blocked assets" under TRIA, and the court issued a second order declining to alter its previous ruling but explaining it in further detail. Rubin v. Islamic Rep. of Iran (Rubin II), 541 F. Supp. 2d 416 (D. Mass. 2008). The court also certified for interlocutory appeal, see 28 U.S.C. § 1292(b), its rulings regarding the applicability of section 201(a) of TRIA, the issue of whether a foreign sovereign's immunity under the FSIA may only be raised by that sovereign, and

-5-

the question of whether the "commercial use" exception applied, Rubin II, 541 F. Supp. 2d at 421. The parties filed petitions for leave to appeal, which we denied, finding that aspects of the legal question of immunity might be bound up with the factual question of ownership and preferring to resolve the immunity question after ownership had been ascertained. Rubin v. Islamic Rep. of Iran, Nos. 08-8020 & 08-8021 (1st Cir. Aug. 11, 2008).

Discovery proceeded, and the Museums once again moved to dissolve the attachments. This time, the district court granted their motions. The court found that, as judgment creditors, the plaintiffs bore the burden of proving that any object on which they sought to execute belonged to Iran, that TRIA did not alter that burden, and that, "despite extensive discovery," the plaintiffs were "unable to sustain their burden of showing that any particular item held by the Museums is the property of Iran subject to execution by means of trustee process." Rubin v. Islamic Rep. of Iran (Rubin III), 810 F. Supp. 2d 402, 404 (D. Mass. 2011). The court examined two Iranian laws that the plaintiffs had invoked, one from 1930 and another from 1928, and concluded that neither vested ownership of the antiquities in Iran. Id. at 404-06. The court thus dissolved the trustee attachments, and this appeal followed.

## II. Analysis

For context, we briefly summarize the complex issues that the parties have put before us, though our resolution of this case does not require us to delve into many of them. The plaintiffs' main argument on appeal is that TRIA preempts state property law, and, when read in conjunction with certain Treasury Department regulations, gives the plaintiffs (in their words) the right to levy against "any interest of Iran, even if that interest is less than a full ownership interest." They further claim that Iran has an interest in the antiquities under Iranian law that is sufficient to make them attachable under TRIA.

The Museums, for their part, counter that TRIA does not displace the traditional rule that a judgment creditor may execute only against assets that a judgment debtor owns, and that the district court was correct in concluding that Iranian law does not vest title to the antiquities in Iran. However, the Museums also challenge the district court's finding that the antiquities qualify as "blocked assets" within the meaning of TRIA -- a prerequisite for that statute to apply. See TRIA § 201(a). Finally, the Museums urge us to find that, even if Iran owns the antiquities and they are theoretically attachable under TRIA, the plaintiffs' claim is barred under Massachusetts law by the three-year statute of limitations and the Museums' adverse possession of the objects.

Also before us is the position of the United States Department of the Treasury's Office of Foreign Assets Control (OFAC), which is responsible for administering and enforcing economic and trade sanctions, including promulgating the regulations at issue here. The United States has filed an amicus brief articulating OFAC's views regarding two aspects of this case. First, OFAC urges us to find that TRIA authorizes the attachment only of those assets that are owned by the relevant terrorist party. Second, providing its own interpretation of the Treasury Department regulations, OFAC argues that the antiquities are not "contested" within the meaning of those regulations, which, if correct, would make TRIA inapplicable here.

Because we agree with OFAC that the antiquities are not "contested," and thus conclude that they cannot qualify as "blocked assets" under TRIA, we need not reach the broader questions of whether TRIA preempts state law, what kind of ownership interest suffices for an asset to be attachable under TRIA, whether Iranian law vests title to these antiquities in Iran, or whether the plaintiffs' claims are foreclosed by the Massachusetts statute of limitations or the adverse possession doctrine. Before we turn our attention to the "blocked assets" issue, however, we must address a last-minute attempt by the plaintiffs to overcome the immunity hurdle posed by the FSIA.

## A. The FSIA

The FSIA makes "the property in the United States of a foreign state" immune from attachment and execution, subject to certain exceptions, 28 U.S.C. § 1609, one of which permits the attachment of property "used for a commercial activity in the United States," assuming the underlying judgment "relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008)," id. § 1610(a)(7). The plaintiffs argued before the district court that the antiquities fell within the scope of that exception. See Rubin I, 456 F. Supp. 2d at 233-34.[2] They claimed that the statute did not require Iran specifically to use the antiquities for commercial purposes in the United States, but that any party (including the Museums) could do so in order for section 1610(a)(7) to be implicated. The district court rejected that argument, holding that "the plain language of the statute, its legislative history, and generally accepted principles of international law establish that the 'commercial use' exception of

_____

[2] The plaintiffs also contended that the Museums did not have standing to assert the immunity of the antiquities under 28 U.S.C. § 1609, because immunity is an affirmative defense, personal to the sovereign. On appeal, they have not challenged the district court's rejection of that argument, which was in accord with other courts' rulings on the issue. See Rubin I, 456 F. Supp. 2d at 231-32; see also Walters v. Indus. & Commercial Bank of China, Ltd., 651 F.3d 280, 290 (2d Cir. 2011); Rubin v. Islamic Rep. of Iran, 637 F.3d 783, 801 (7th Cir. 2011); Peterson v. Islamic Rep. of Iran, 627 F.3d 1117, 1128-29 (9th Cir. 2010); Walker Int'l Holdings Ltd. v. Rep. of Congo, 395 F.3d 229, 233 (5th Cir. 2004).

§ 1610 applies only where it is the foreign sovereign who engages in the commercial activity."  Id. at 234.

In their opening brief on appeal, the plaintiffs did not challenge that holding.  However, after the Museums addressed section 1610(a)(7) in their briefs, the plaintiffs filed a reply brief, arguing for the first time that we should permit execution under section 1610(g) of the FSIA, see 28 U.S.C. § 1610(g), which Congress enacted in January 2008 as part of the National Defense Authorization Act (NDAA), Pub. L. No. 110-181, § 1083(b)(3)(D), 122 Stat. 3, 341-42 (2008).  The plaintiffs read section 1610(g) as allowing a judgment creditor to execute against "any property interest" whatsoever of a foreign state.

The NDAA provides that qualifying judgments entered under the old version of the FSIA should, "on motion made by plaintiffs to the United States district court where the action was initially brought . . . be given effect as if the action had originally been filed under" the new version of the statute.  NDAA § 1083(c)(2)(A).  In March 2008, the plaintiffs filed such a motion in the D.C. district court where they had obtained the default judgment, and the motion was granted in June 2008.[3]  Rubin v. Islamic Rep. of

---

[3] After the plaintiffs filed their motion for retroactive application of the NDAA, the Museums wrote a letter to the D.C. district court, arguing that the plaintiffs had not satisfied the requirements of section 1083(c)(2)(A) of the NDAA.  Rubin v. Islamic Rep. of Iran, 270 F.R.D. 7, 9 (D.D.C. 2010).  However, the court did not receive the Museums' letter until the day it granted the plaintiffs' motion, id. at 9 n.2, and it denied as untimely the

Iran, 270 F.R.D. 7, 9 (D.D.C. 2010). The Massachusetts district court issued its initial immunity ruling in this case in 2006, see Rubin I, 456 F. Supp. 2d 228, but it certified that ruling for interlocutory appeal in March 2008 (two months after the enactment of the NDAA and three days after the plaintiffs filed their motion for retroactive application of the NDAA with the D.C. district court), see Rubin II, 541 F. Supp. 2d at 421, and the case continued before the Massachusetts district court well into 2011, see Rubin III, 810 F. Supp. 2d 402.

At no point, however, did the plaintiffs bring the FSIA amendment or the 2008 D.C. district court decision to the attention of the Massachusetts district court in the instant trustee process action. Nor did the plaintiffs make any argument pertaining to section 1610(g) in their opening brief on appeal.[4] They made the argument for the first time in their reply brief, claiming that they had no opportunity to raise the applicability of section 1610(g) before the district court. We reject that excuse, given that more than three years passed between the amendment of the FSIA

_____

Museums' later motion to intervene for the purpose of seeking reconsideration, id. at 12.

[4] In their reply brief, the plaintiffs place great weight on the fact that the Museums tried to intervene in the 2008 D.C. district court action and thus were on notice that the plaintiffs might attempt to invoke section 1610(g) in the Massachusetts proceeding. That does not, however, excuse the plaintiffs' failure to raise their section 1610(g) argument before the Massachusetts district court or in their opening brief on appeal.

and the district court's final ruling in this case. In any event, the plaintiffs have provided no compelling explanation for their additional failure to invoke section 1610(g) in their opening brief on appeal.

We therefore refuse to consider the applicability of section 1610(g). See Anderson v. Hannaford Bros. Co., 659 F.3d 151, 158 n.5 (1st Cir. 2011) (reiterating the basic rule that an argument not raised before the district court is deemed waived); N. Am. Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 45 (1st Cir. 2001) ("There are few principles more securely settled in this court than the principle which holds that, absent exceptional circumstances, an appellant cannot raise an argument for the first time in a reply brief.").

**B. TRIA**

Nonetheless, under certain circumstances, TRIA permits the attachment of property that might otherwise be immune under the FSIA. See Bennett v. Islamic Rep. of Iran, 618 F.3d 19, 21 (D.C. Cir. 2010). The relevant section of TRIA provides that "[n]otwithstanding any other provision of law . . . , a person [who] has obtained a judgment against a terrorist party on a claim based upon an act of terrorism" may attach and execute on "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)" in order to satisfy the judgment. TRIA § 201(a). TRIA thereby

-12-

allows a person to circumvent the normal process for attaching assets that are blocked under a sanctions program, which entails obtaining a license from OFAC. See, e.g., 31 C.F.R. §§ 535.201, 535.310, 515.201, 515.310, 594.201, 594.312.

There exists some debate as to whether TRIA preempts state property law and whether the phrase "assets of that terrorist party" in section 201(a) means that the terrorist party must actually own the assets. Compare Hausler v. JPMorgan Chase Bank, N.A., 845 F. Supp. 2d 553, 562-68 (S.D.N.Y. 2012), and Hausler v. JP Morgan Chase Bank, N.A., 740 F. Supp. 2d 525, 529-39 (S.D.N.Y. 2010), with Calderon-Cardona v. JPMorgan Chase Bank, N.A., 867 F. Supp. 2d 389, 399-405 (S.D.N.Y. 2011). But even if we assume, simply for the sake of argument, that the antiquities at issue here qualify as "assets of" Iran under section 201(a), they would also need to be "blocked" in order to fall within TRIA's scope. See Ministry of Def. & Support for the Armed Forces of the Islamic Rep. of Iran v. Elahi, 556 U.S. 366, 369 (2009) ("[W]e initially decide whether Iran's Cubic Judgment is a 'blocked asset' within the terms of [TRIA]."). That question of law, whether viewed as one of statutory interpretation or one of foreign sovereign immunity, is subject to de novo review. See Hernández-Miranda v. Empresas Díaz Massó, Inc., 651 F.3d 167, 170 (1st Cir. 2011); Ungar v. Palestine Liberation Org., 402 F.3d 274, 288 (1st Cir. 2005).

The plaintiffs claim that the Museums did not appeal the district court's decision that the antiquities are "blocked assets" under TRIA and thus argue that that order is "the law of this case." Not so. At the Museums' request, the district court certified its "blocked assets" ruling for interlocutory appeal. See Rubin II, 541 F. Supp. 2d at 421. The Museums then filed a petition for permission to appeal under 28 U.S.C. § 1292(b), which we denied. Rubin v. Islamic Rep. of Iran, Nos. 08-8020 & 08-8021 (1st Cir. Aug. 11, 2008). At the time, we believed that the "blocked assets" question might be bound up with the factual question of ownership and was best resolved, if necessary, after the district court had determined who owned the antiquities. Id. Now, with the benefit of further factual development and, more importantly, of briefing by OFAC, we find the issue dispositive. In any event, this is the first opportunity the Museums have had to raise their "blocked assets" argument on appeal.

TRIA defines the phrase "blocked asset" as "any asset seized or frozen by the United States . . . under sections 202 and 203 of the International Emergency Economic Powers Act" (IEEPA), Pub. L. No. 95-223, §§ 202-203, 91 Stat. 1625, 1626 (1977) (codified at 50 U.S.C. §§ 1701-1702). TRIA § 201(d)(2)(A). We have described the IEEPA as codifying "Congress's intent to confer broad and flexible power upon the President to impose and enforce economic sanctions against nations that the President deems a

-14-

threat to national security interests." United States v. McKeeve, 131 F.3d 1, 10 (1st Cir. 1997).  OFAC is responsible for administering sanctions imposed under the IEEPA.

In 1979, in response to the Iranian hostage crisis, President Carter issued an IEEPA-based executive order ("the 1979 order"), which OFAC later implemented though regulations, blocking all transactions involving "property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States" in which Iran had "any interest of any nature whatsoever," unless OFAC authorized the transaction.  31 C.F.R. § 535.201; see also Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979).

OFAC's 1979 blocking order remains in place, but its effect was significantly circumscribed by the 1981 Algiers Accords, pursuant to which the United States and Iran resolved the hostage crisis and the United States promised to "revoke all trade sanctions" that had been directed against Iran since November 1979 and to arrange "for the transfer to Iran of all Iranian properties . . . located in the United States" that were not addressed by other parts of the agreement.  Declaration of the Government of the Democratic and Popular Republic of Algeria, U.S.-Iran, Jan. 19, 1981, 20 I.L.M. 224, 227; see also Elahi, 556 U.S. at 370.  As part of the Accords, President Carter issued Executive Order 12,281 ("the 1981 order"), which directed "[a]ll persons subject to the

-15-

jurisdiction of the United States in possession or control of properties, not including funds and securities, owned by Iran or its agencies, instrumentalities, or controlled entities" to "transfer such properties, as directed after the effective date of this Order by the Government of Iran." 46 Fed. Reg. 7,923, 7,923 (Jan. 19, 1981). The Algiers Accords automatically unblocked most Iranian assets that existed in this country at the time. Weinstein v. Islamic Rep. of Iran, 609 F.3d 43, 55 (2d Cir. 2010).

OFAC's implementing regulation closely mirrors the language of the 1981 order. It requires "all persons subject to the jurisdiction of the United States in possession or control of properties, as defined in [31 C.F.R. § 535.333] . . . to transfer such properties held on January 18, 1981 as directed after that day by the Government of Iran." 31 C.F.R. § 535.215(a). Section 535.333, in turn, defines the universe of "properties" unblocked by the 1981 order: "all uncontested and non-contingent liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities, including debts." Id. § 535.333(a).[5] A property interest cannot be "contested" under section 535.333 unless "the holder thereof reasonably believes that

_____

[5] The "contested"/"uncontested" distinction in 31 C.F.R. § 535.333 was apparently meant to clarify that "Iran was not entitled to possession of properties owned by others or if it had only a partial or contingent interest in such property." Islamic Rep. of Iran v. United States, 28 Iran-U.S. Cl. Trib. Rep. 112, 127, 1992 WL 928957 (1992).

-16-

Iran does not have title or has only partial title to the asset." Id. § 535.333(c). "After October 23, 2001, such a belief may be considered reasonable only if it is based upon a bona fide opinion, in writing, of an attorney licensed to practice within the United States stating that Iran does not have title or has only partial title to the asset." Id.

Thus, to further narrow the issue, we must determine whether the antiquities in the Museums' possession are "contested" within the meaning of the OFAC regulations and therefore blocked under the 1979 order (in which case they would be attachable under TRIA), or whether they are "uncontested" and therefore unblocked under the 1981 order (in which case they would not be attachable under TRIA).[6]

In resolving that question, the district court unfortunately did not have the benefit of briefing by OFAC, which only became involved in this matter on appeal. The court recognized that the 1981 order and regulations envision a "binary" contest of ownership between Iran and an asset holder in the United States. Rubin II, 541 F. Supp. 2d at 419. The court, however, read TRIA as inserting the interests of a third-party judgment creditor into that equation. An asset can become "contested," the

---

[6] The plaintiffs have not claimed that any of the antiquities at issue here qualify as "blocked assets" under the President's February 2012 Iranian asset blocking order, see Exec. Order No. 13,599, 77 Fed. Reg. 6,659 (Feb. 5, 2012), or any other sanctions regime.

court concluded, where the judgment creditor asserts Iran's ownership of the property, id. at 419-20, "notwithstanding the absence of any contest between the actual holder and Iran," id. at 419. The court's construction was based, in part, on the fact that, under Massachusetts law, "[a] creditor's assertion that property held by a putative trustee belongs to the debtor and may be taken by the creditor for application against the debt is fundamental to trustee process." Id. at 420.

On appeal, OFAC directs our attention to the plain language of the 1981 order and regulation, which require a transfer only "as directed . . . by the Government of Iran." 46 Fed. Reg. at 7,923; 31 C.F.R. § 535.215(a). That, OFAC argues, is a condition precedent for the rest of what the regulations envision. Only if Iran directs the transfer of an asset being held in the United States must the property holder transfer the asset, or challenge Iran's ownership by obtaining an opinion of counsel, see 31 C.F.R. § 535.333(c), which would make the asset "contested," id., at least until ownership is ascertained. In the absence of any claim by Iran, however, the asset remains "uncontested." Id. § 535.333(a).

OFAC also notes that TRIA was drafted against the backdrop of the relevant regulations, not the other way around. The regulations were last amended in 2001, a year before TRIA was enacted. See 66 Fed. Reg. 38,553 (July 25, 2001). We agree with

OFAC that it was therefore inappropriate for the district court to interpret the regulations in light of the later-enacted TRIA. See Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). That is particularly true given Congress's explicit reference to the IEEPA, and by extension the OFAC regulations that implement IEEPA-based executive orders, through its use of the phrase "blocked assets" in TRIA.  TRIA § 201(d)(2)(A).

Because Iran has never made a claim to, or directed transfer of, any of the antiquities at issue here, Rubin III, 810 F. Supp. 2d at 406 n.3; Rubin II, 541 F. Supp. 2d at 420, OFAC argues that the antiquities cannot be "contested" for purposes of 31 C.F.R. § 535.333.  We must defer to OFAC's interpretation unless it is "plainly erroneous or inconsistent with the regulation[s]." Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 880 (2011) (citation and internal quotation marks omitted).  The fact that blocked assets play an important role in the conduct of United States foreign policy may provide a further reason for deference to the views of the executive branch in this case, see Rep. of Austria v. Altmann, 541 U.S. 677, 701-02 (2004); Estate of Heiser v. Islamic Rep. of Iran, ___ F. Supp. 2d ___, 2012 WL 3776705, at *10 (D.D.C. Aug. 31, 2012), but we need not rely on that alternate ground, because we find OFAC's interpretation to be a reasonable one.

Two additional points bolster OFAC's view. First, the regulations clearly state that "property interests shall not be deemed to be contested solely because they are subject to an attachment," 31 C.F.R. § 535.333(d), and we have some doubt as to whether the district court's holding can be squared with that language.

Second, we are not convinced that OFAC's interpretation entirely "negate[s] TRIA's remedy as to judgment creditors of Iran." Rubin II, 541 F. Supp. 2d at 420. If Iran directed a transfer of the antiquities, and the Museums contested ownership, the antiquities might qualify as "blocked assets" within the meaning of TRIA. Furthermore, "Iran is the subject of numerous sanctions and blocking programs," Levin v. Bank of N.Y., No. 09 CV 5900, 2011 WL 812032, at *13 (S.D.N.Y. Mar. 4, 2011), and there may well be other blocked Iranian assets that the plaintiffs can reach, including bank assets, see, e.g., Weinstein, 609 F.3d at 56 (allowing relatives of victim of Iran-sponsored terrorism to attach assets of Bank Melli, an instrumentality of Iran); Weinstein v. Islamic Rep. of Iran, 274 F. Supp. 2d 53, 61-62 (D.D.C. 2003) (allowing survivors of suicide-bombing victim to attach assets held in two bank accounts formerly used by Iranian consulates in the United States). The pool of assets available to the plaintiffs does appear to be quite limited, see Estate of Heiser, 2012 WL

3776705, at *6, which is certainly lamentable, but we cannot rewrite the statutory or regulatory text.

We therefore defer to OFAC's reasonable position that an asset can be "contested" for purposes of 31 C.F.R. § 535.333 only if Iran itself has claimed an interest in the asset. See Chase Bank, 131 S. Ct. at 880. Iran has never made such a claim with regard to the antiquities in the Museums' possession. Thus, even if we assume that those antiquities qualify as "assets of" Iran under section 201(a) of TRIA, they would be "uncontested" assets that were unblocked in 1981, pursuant to Executive Order 12,281. The 1979 order and 31 C.F.R. § 535.201 are thus inapplicable here. Because the plaintiffs have relied on no other authority to support their claim that the antiquities are "blocked" within the meaning of TRIA, we conclude that the antiquities are not attachable under that statute. TRIA §§ 201(a), (d)(2)(A).

Having reached that conclusion, we need not decide whether the Museums' belief that Iran does not own the antiquities could be "reasonable" in the absence of a "bona fide opinion, in writing, of an attorney licensed to practice within the United States stating that Iran does not have title or has only partial title to the asset." 31 C.F.R. § 535.333(c); see Rubin II, 541 F. Supp. 2d at 420-21. The Museums would have had the duty to obtain such an opinion only if Iran had made a demand for the antiquities

-21-

and the Museums wished to contest ownership.  <u>See</u> 31 C.F.R. §§ 535.215(a), 535.333(a).

### III. Conclusion

While we are mindful of the incident that gave rise to the judgment here and the difficulty the plaintiffs are having collecting on that judgment, the general rule is that foreign sovereign property in the United States is immune from attachment and execution.  <u>See</u> 28 U.S.C. § 1609.  TRIA carves out a narrow exception to that rule, applicable only to "blocked assets," and the plaintiffs have failed to demonstrate that any of the antiquities in the Museums' possession fall within that exception. TRIA therefore does not nullify the antiquities' immunity from execution under the FSIA, and the plaintiffs have waived any challenge to that immunity on appeal.

Thus, while we disagree with the district court's judgment that the antiquities qualify as "blocked assets" under TRIA, <u>Rubin II</u>, 541 F. Supp. 2d 416, we <u>affirm</u> its conclusion that the plaintiffs' Motion for Order of Attachment by Trustee Process should be denied and that the Museums' motions to dissolve the attachments should be granted.