**MINISTRY OF DEFENSE AND SUPPORT FOR the ARMED FORCES OF the ISLAMIC REPUBLIC OF IRAN, Petitioner,**

v.

**CUBIC DEFENSE SYSTEMS, INC., Respondent,**

and

**Jenny Rubin, et al.; and France Rafii, Lien Claimants.**

**Case No. 98–CV–1165–B (DHB).**

United States District Court, S.D. California.

Nov. 27, 2013.

Mina Almassi, Steven William Kerekes, Law Offices of Steven W. Kerekes, Los Angeles, CA, for Petitioner.

Charles A. Bird, Michelle Ann Herrera, McKenna Long & Aldridge LLP, San Diego, CA, for Respondent.

David J. Strachman, McIntyre, Tate & Lynch, LLP, Providence, RI, James E. McElroy, Law Offices of James E. McElroy, San Diego, CA, Jonathan R. Mook, DiMuro Ginsberg PC, Alexandria, VA, for Lien Claimants.

## ORDER GRANTING LIEN CLAIM-ANTS' MOTION TO ATTACH CUBIC JUDGMENT

BARRY TED MOSKOWITZ, Chief Judge.

This motion concerns an attempt by ten American citizens[1] to collect judgments against the Islamic Republic of Iran ("Iran") for personal injuries arising out of the country's terrorist activities. The Lien Claimants seek to attach the $2.8 million judgment that the Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran (hereinafter "MOD" or "MODSAF") obtained in this arbitration case.[2] MOD opposes the motion by invoking its sovereign immunity as well as its

[1.] Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersh, Renay Frym, Noam Rozenman, Elana Rozenman Tzvi Rozenman, and France M. Rafii (hereinafter collectively referred to as "Lien Claimants").

[2.] With accrued interest and the addition of attorneys' fees, over $9.4 million is available. See Doc. Nos. 208, 235, 287, 294.

rights under the Algiers Accords, an international agreement between Iran and the United States. Declaration of the Government of the Democratic and Popular Republic of Algeria, U.S.—Iran, 20 I.L.M. 224 (Jan. 1981). In addition to extensive briefing by the parties,[3] the United States Department of Justice filed a Statement of Interest. Doc. No. 277; 28 U.S.C. § 517. The Court heard oral argument on January 8, 2013.

Having carefully considered the arguments of counsel and the governing law, the Court holds that Lien Claimants are entitled to the relief they seek. The Court holds that the Cubic Judgment is subject to attachment under § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), as well as § 1610(g) of the Foreign Sovereign Immunities Act of 1976 ("FSIA"). The Court does not at this time release the funds, which are on deposit with the Clerk of the Court. The Court stays *disbursement* of funds pending appeal, but *title* to the funds is immediately vested in the Lien Claimants (in a manner to be determined by a future Order). Also, the Lien Claimants must submit additional information.

## I. *BACKGROUND*

After two decades adjudicating the dispute in various forums, the parties are well-acquainted with the facts, thus, the Court describes only those essential to the pending motion. The first section summarizes the facts underlying the $2.8 million Cubic Judgment in MOD's favor; the second background section describes the terrorism-related judgments held by the Lien Claimants against Iran.

## A. *Military Equipment Contracts and the Cubic Judgment*

In 1977, while the Shah governed Iran, Cubic Defense Systems, Inc. ("Cubic") entered into two contracts to sell and maintain an air combat maneuvering range system ("ACMR") to MOD.[4] The contracts had arbitration clauses and were governed by Iranian law. MOD's Request for Judicial Notice, Ex. C ¶¶ 2.6, 7.4 (hereinafter "Final Award"). By October 1978, Iran had paid over $12 million of the purchase price and modest sums on the service contract. *Id.* ¶ 2.2; *MOD v. Cubic,* 29 F.Supp.2d 1168, 1170 (S.D.Cal.1998).[5] By February 1979, Cubic obtained export permits and was poised to transfer ownership of the equipment to Iran.

In November 1979, the Iranian revolution—which replaced the monarchy with the theocratic Islamic Republic of Iran, disrupted foreign relations with the United States, and culminated in the hostage crisis at the American Embassy—permanently prevented full performance of the military equipment contracts. Final Award ¶¶ 8.3, 8.8, 8.12, 8.18; *see generally MOD v. Gould, Inc.,* 887 F.2d 1357 (9th Cir.1989) (describing American foreign policy implications of revolution in Iran).

---

3. The Court grants MOD leave to file its supplemental brief late. Doc. No. 288. Recently, the Lien Claimants submitted an unauthorized supplemental brief. Doc. No. 297; Civ. LR 7.1(e)(7). The Court has read the brief, but it does not raise any issue that warrants further briefing or discussion.

4. The original contracts were entered into by predecessors, but their former names are immaterial.

5. In the interest of brevity, the Court omits the extensive subsequent history from citations to earlier published decisions in this same action, including: *MOD v. Cubic,* 29 F.Supp.2d 1168 (S.D.Cal.1998) and *MOD v. Cubic,* 236 F.Supp.2d 1140 (S.D.Cal.2002) *aff'd on other grounds* 385 F.3d 1206 (9th Cir.2004), *vacated and remanded by MOD v. Elahi,* 546 U.S. 450, 126 S.Ct. 1193, 163 L.Ed.2d 1047 (2006) (per curiam), *on remand,* 495 F.3d 1024 (9th Cir.2007), *rev'd,* 556 U.S. 366, 129 S.Ct. 1732, 173 L.Ed.2d 511 (2009), *on remand,* 665 F.3d 1091 (9th Cir.2011).

In 1991, MOD initiated arbitration proceedings with the International Chamber of Commerce ("ICC"). The ICC found that the parties agreed to discontinue the contracts in light of the Islamic revolution, and reached a modified agreement that allowed Cubic to sell the ACMR to another country. Final Award ¶¶ 9–10. "Depending on the result of the attempt to resell the System, either [Iran] became entitled to be (partly) reimbursed for the payments it had made to Cubic, or Cubic became entitled to claim, in balance, an additional payment from Iran." *Id.* ¶ 11.28. In the Fall of 1982, Cubic sold the military equipment to Canada, yet Cubic ignored Iran's requests for an accounting.[6] *E.g., id.* ¶¶ 6.1, 10.8, 16.1(h); *Elahi,* 556 U.S. at 372, 129 S.Ct. 1732 (observing "that Cubic had not lived up this modified agreement"). In May 1997, the ICC held that Cubic owed MOD $2.8 million plus interest and costs. Final Award ¶ 21.

In 1998, MOD filed a petition to confirm the arbitration award. This Court confirmed the arbitration award on December 7, 1998.[7] *MOD,* 29 F.Supp.2d 1168. The "Cubic Judgment" was entered on August 10, 1999.

After years of appeals, the contract dispute is now resolved and the funds have been deposited with this Court.[8]

## B. *Lien Claimants Seek to Satisfy Terrorism–Related Judgments* [9]

### 1. *Claimant France M. Rafii*

In 2001, Rafii, a United States citizen, sued Iran and the Ministry of Information and Security ("MOIS") for the wrongful death of her father Dr. Shapour Bakhtiar, the former prime minister of Iran. Compl. *Rafii v. Islamic Republic of Iran,* No. 01–CV–850–CKK (D.D.C. filed Apr. 18, 2001), ECF No. 1.[10] Rafii filed suit pursuant to

---

**6.** The record is not entirely clear, but it appears that Canada expressed interest in buying the equipment in 1981, and the sale was completed in 1982. *Compare Elahi,* 556 U.S. at 372–74, 129 S.Ct. 1732 (arbitrators found that Cubic sold system in September 1981) *and* MOD's Opp. Br. at 13 n. 2 (stating Cubic sold equipment to Canada on September 16, 1981) *with Elahi,* 556 U.S. at 375–77, 129 S.Ct. 1732 (Cubic completed sale to Canada in October 1982).

**7.** The Honorable Rudi M. Brewster presided over the district court proceedings from 1998 until his death in 2012. The parties consented to have the under-signed judge dispose of the remaining motions. Doc. Nos. 259, 265, 269.

**8.** Regulations bar transfer of funds to Iran, thus, Cubic applied for, and in March 2012, received a license from Office of Foreign Assets Control ("OFAC") of the Department of the Treasury. Doc. No. 203 Ex. C; *see generally Rubin v. Islamic Republic of Iran,* 709 F.3d 49, 55 (1st Cir.2013) ("OFAC is responsible for administering sanctions imposed", by President); MOD's Request for Judicial Notice, Ex. E (Decl. of Dir. Newcomb describes

function of OFAC). The license permits the judgment funds to be held by the Clerk of the Court; and depending upon the outcome of the case the OFAC license permits the funds to be deposited into a blocked bank account in MOD's name *or* distributed to successful Lien Claimants under TRIA. Doc. No. 201. At the hearing, Cubic renewed its request to be relieved of its reporting obligations. *See* Doc. No. 235 (denying Cubic's request to shift administrative-burden to Court). The Court finds no basis to shift the duties to any other party than the licensee. Thus, Cubic shall maintain its license with OFAC.

**9.** Rafii currently holds the senior lien, followed by the Rubin Claimants. Prior liens by Stephen Flatlow and Daniel Elahi were resolved in prior appeals. *Elahi,* 556 U.S. 366, 129 S.Ct. 1732; *see* Doc. Nos. 40 & 67. The Peterson claimants have not pursued their junior lien. *See* Doc. No. 171. The *Estate of Heiser* withdrew its motion. Doc. Nos. 208, 214, 219.

**10.** The Court viewed the Lien Claimants' court documents in PACER. Fed.R.Evid. 201; *Ben–Rafael v. Islamic Republic of Iran,* 718 F.Supp.2d 25, 31 (D.D.C.2010).

the terrorism exception in FSIA based on her allegation that agents of Iran assassinated Dr. Bakhtiar for his political opposition to the Islamic regime. 28 U.S.C. § 1605(a)(7) (2006) (repealed in 2008 and replaced by 28 U.S.C. § 1605A). Defendants did not appear.

In 2002, the Honorable Colleen Kollar-Kotelly conducted a two-day bench trial; made the necessary factual, jurisdictional, and statutory findings; and entered default judgment against Iran for $5 million compensatory damages. Order & Findings of Fact and Conclusions of Law *Rafii,* 01–CV–850–CKK (D.D.C. filed Dec. 2, 2002), ECF 21 (also awarding compensatory and punitive damages against MOIS).[11]

In 2003, Rafii filed a notice of lien on the Cubic Judgment.[12] Doc. No. 124. She attached a copy of the registered default judgment and served MOD's counsel in this action. *Id.* at 4 & Ex. A.

### 2. *The Nine Rubin Claimants*

Using the then-existing terrorism exception to FSIA, 28 U.S.C. § 1605(a)(7), the Rubin suit was filed in 2001 based upon a suicide bomb attack by Hamas at a pedestrian mall in Jerusalem in 1997. Compl. *Rubin v. Islamic Republic of Iran,* No. 01–CV–1655–RMU (D.D.C. filed July 31, 2001), ECF No. 1 (hereinafter *Rubin,* No.

01–CV–1655–RMU). Several American citizens were injured, and nine pursue the Cubic Judgment (hereinafter the "Rubin Claimants"). These include five who were present at the bombing (J. Rubin, Miller, Mendelson, Hersh, and N. Rozenman), and four relatives who sought pain and suffering damages (D. Rubin, Frym, E. Rozenman, and T. Rozenman). Iran and its codefendants (MOIS and three senior officials) did not appear.

In 2003, the Honorable Ricardo M. Urbina of the District of Columbia District Court conducted an evidentiary hearing before concluding that Defendants provided terrorist training and other material assistance to the bombers. *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258 (D.D.C.2003) (findings of fact & conclusions of law in consolidated actions, including the Rubin claimants). The Court entered default judgment in 2003. Order & Judgment *Rubin v. Islamic Republic of Iran,* No. 01–CV–1655–RMU (D.D.C. filed Sept. 10, 2003), ECF No. 23. The Court ordered Iran to pay the nine Rubin Claimants compensatory damages ranging from $2.5 million to $15 million. *Campuzano,* 281 F.Supp.2d at 275–77.[13]

In 2008, Congress repealed § 1605(a)(7) and replaced it with an improved cause of

---

**11.** FSIA § 1608(a)(3) permits service of the complaint on the United States Department of § State. The docket on PACER shows that Rafii took advantage of that method and that the Clerk served the complaint on the Department of State which then served Iran through diplomatic channels. There is no indication, however, that the default judgment was served on Iran as required by § 1608(e).

**12.** Both Rafii and Rubin listed Cubic's appeal bond however, the Court exonerated the bond in 2012, thus, this request is moot. Doc. No. 235.

**13.** The docket on PACER shows that the complaint was served on Iran by various means. In 2004, as instructed by Judge Urbina, the

Clerk served the translated default judgment on the State Department for service on Iran. § 1608(e). The 2008 Order was not served on Iran. However, FSIA does not require service of post judgment documents on a foreign state in default. *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117, 1129–30 & n. 5 (9th Cir.2010); *Estate of Heiser v. Islamic Republic of Iran,* 807 F.Supp.2d 9, 23 (D.D.C.2011).

As of July 2008, the Rubin Claimants had collected $400, 000 on their judgment. Pls.' Motion at 2 *Rubin* Case No. 01–CV–1655–RMU (D.D.C. filed Mar. 28, 2008), ECF 76; *cf. Rubin,* 709 F.3d 49 (rejecting attempt to attach museum assets); *Bank of New York v. Rubin,* 484 F.3d 149 (2d Cir.2007) (per curiam) (denying motion to attach bank accounts).

action § 1605A to sue foreign terrorists. National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110–181, § 1083, 122 Stat. 3 (2008). The amendment permitted plaintiffs with a pending terrorism-related lawsuit to ask the court to give their case "effect as if the action had originally been filed" under the new provision. *Id.* § 1083(c)(2)(A) (Application to Pending Cases). The Rubin plaintiffs promptly took advantage of the opportunity because their case was still pending as defined by the statute. *Id.;* Motion Pursuant to § 1083(c)(2) *Rubin,* No. 01–CV–1655–RMU (D.D.C. filed Mar. 28, 2008), ECF No. 76. In June 2008, the District Court granted the motion. Memorandum Order at 2 n. 3, 5, *Rubin,* No. 01–CV–1655–RMU (D.D.C. filed June 3, 2008) (noting "seven-year litigious saga" that included remand to resolve the pending motion pursuant to Fed.R.Civ.P. 60(b)), ECF No. 81.

In 2003, and as amended in 2009, the nine Rubin Claimants filed a notice of lien totaling $71.5 million.[14] Doc. Nos. 130 & 145. MOD's attorney was served with both versions of the notice and a copy of the 2003 default judgment. Doc. Nos. 130 at 42 & Ex. B, 144, & 145, Ex. A.

Now before the Court is the joint motion by Lien Claimants to attach the Cubic Judgment to satisfy a portion of their default judgments against Iran. The motion to attach is a simple matter as MOD does not contest that Lien Claimants complied with the procedural requirements. The complexities arise from MOD's assertion of sovereign immunity and its reliance on the Algiers Accords. As in the past, "[d]etermining the viability of MOD's claim requires us to follow a labyrinthine path through several statutes and regulations." *MOD,* 385 F.3d at 1214.

**14.** As discussed below, the Rubin Claimants may rely on the broad exception to attach-

## II. *LEGAL PRINCIPLES*

### A. *Algiers Accords*

In the course of the Iranian revolution, Iran took hostages at the American Embassy in Tehran in November 1979. President Carter responded by issuing Executive Order 12170, which "blocked all property and interests in property of the Government of Iran." Exec. Order 12170 (Nov. 14, 1979). The International Emergency Economic Power Act ("IEEPA") authorizes the President to block any property interest of a foreign country to deal with an "unusual and extraordinary threat ... to the national security, foreign policy, or economy of the United States." 50 U.S.C. §§ 1701(a), 1702(a). "The frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country." *Dames & Moore v. Regan,* 453 U.S. 654, 673–74, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

The Department of Treasury's OFAC immediately promulgated the Iranian Assets Control Regulations ("IACR") to execute the sanction. 31 C.F.R. pt. 535; 44 Fed.Reg. 65956–01 (Nov. 15, 1979). In particular, the IACR states that "[n]o property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, or withdrawn or otherwise dealt in except as authorized." 31 C.F.R. § 535.201 (2013). The freeze took effect on November 14, 1979.

On January 19, 1981, the United States settled the hostage crisis and entered the Algiers Accords with Iran. The United States promised to ensure that Iran would recover its frozen assets. "General Principle A" states:

ment immunity in § 1610(g), which Congress added to FSIA in 2008.

Within the framework of and pursuant to the provisions of the two Declarations of the Government of the Democratic and Popular Republic of Algeria, the United States *will restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979*. In this context, the United States commits itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction, as set forth in Paragraphs 4–9.

MOD's Request for Judicial Notice, Ex. A (emphasis added). Paragraph 9 provides that the United States would arrange for the transfer of all Iranian property, located in the United States, as would have been allowed before November 14, 1979. *Id.*

In addition, Article II established the Iran—United States Claims Tribunal (hereinafter "Tribunal") "to resolve disputes between the two nations concerning each other's performance under the Algiers Accord." *Elahi*, 556 U.S. at 371, 129 S.Ct. 1732. The Tribunal has jurisdiction to interpret the agreement. MOD's Request for Judicial Notice, Ex. A, Art. II(3). The Tribunal still has jurisdiction over Iran's claim that the United States should pay damages for failing to transfer the ACMR as required by the Algiers Accord. MOD's Request for Judicial Notice, Exs. A

& F; *Elahi*, 556 U.S. at 371, 129 S.Ct. 1732 (noting that Case No. B61 involves the military equipment built by Cubic but never exported from the United States to Iran); MOD's Opp. Br. at 6–7 (citing Contract No. 134 as the ACMR contracts between Iran and Cubic).[15]

To comply with the Algiers Accord, the United States lifted President Carter's 1979 sanction (Executive Order 12170) and unblocked Iranian assets. *See generally Elahi*, 556 U.S. at 370–71, 129 S.Ct. 1732 (collecting citations to regulations); *Rubin*, 709 F.3d at 55–56 (reviewing history); *Weinstein v. Islamic Republic of Iran*, 299 F.Supp.2d 63, 65–68 (S.D.N.Y.2004) (same); MOD's Request for Judicial Notice, Ex. E (OFAC's Director Newcomb describes history of Iran sanctions and regulations). The Department of Treasury amended the IACR to reflect the settlement. 46 Fed.Reg. 14336 (Feb. 26, 1981). For example, OFAC issued a general license authorizing transactions involving property in which Iran's interest arose after January 19, 1981, the date of the Algiers Accord. *Elahi*, 556 U.S. at 370–71, 129 S.Ct. 1732 (citing 31 C.F.R. § 535.579(a)).

### B. *Foreign Sovereign Immunities Act of 1976*

 The Iranian government is protected by sovereign immunity. *Saudi*

---

15. In January 1982, Iran filed two cases in the Tribunal relating to the Cubic contracts. One claim has been resolved. *Elahi*, 556 U.S. at 371, 129 S.Ct. 1732.

In Case No. B66, the Tribunal held that it did not have jurisdiction over Cubic and that the contracts did not impose obligations on the United States. MOD's Request for Judicial Notice, Ex. B ¶ 11; *Elahi*, 556 U.S. at 371–72, 129 S.Ct. 1732. The Tribunal dismissed Case No. B66 in April 1987. That decision freed MOD to pursue its contract claims against Cubic in arbitration.

In the second case, the Tribunal held that the United States could prohibit the export of

military equipment, but it had an "implicit obligation" to compensate Iran for any losses caused by its failure to issue export licenses on military equipment owned by Iran. MOD's Request for Judicial Notice, Ex. D ¶¶ 112, 125,133, 141, 183. The Tribunal found that Iran had to prove that it sustained a financial loss, and that part of the B61 claim is still pending. *Id.* ¶¶ 170, 180.

Further, the United States contends that any money Iran collects from Cubic will be deducted from any money the United States might owe Iran in the B61 claim. *Id.* Ex. G. Iran disputes this setoff argument. MOD Opp. Br. at 13–14 n. 2; Doc. No. 271 at 12.

*Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) ("[A] foreign state is presumptively immune from suit in United States' courts."). Absent an exception in FSIA, 28 U.S.C. §§ 1602–1611, it cannot be sued in federal court nor can its assets be attached to satisfy a judgment. *Saudi Arabia*, 507 U.S. at 355, 113 S.Ct. 1471 (FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.") (quotation and citation omitted); *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 799 (7th Cir.2011) ("immunity inheres in the property itself"), *cert. denied*, ─── U.S. ───, 133 S.Ct. 23, 183 L.Ed.2d 692 (2012). A foreign state does not waive its immunity simply by failing to appear in court. *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 295–96 (2d Cir.2011) (collecting cases).

■ FSIA governs the scope of sovereign immunity of a foreign state and its political subdivisions, agencies, and instrumentalities. 28 U.S.C. §§ 1602–1611. Because MOD is an inseparable part of the state of Iran, it qualifies as a "foreign state" within the meaning of FSIA § 1603(a). *MOD*, 495 F.3d at 1034–36; *Garb v. Republic of Poland*, 440 F.3d 579, 596 & n. 21 (2d Cir.2006) (as used in FSIA, "[t]he term 'political subdivisions' includes all governmental units beneath the central government"); *Reed v. Islamic Republic of Iran*, 845 F.Supp.2d 204, 210 (D.D.C. 2012) (Ministry of Information is a political subdivision of Iran for purpose of FSIA) (citations omitted). In those instances when FSIA treats the foreign state and its political subdivisions differently than an agency or instrumentality,[16] MOD enjoys the same sovereign immunity afforded to the foreign state itself.[17]

There are two types of immunity: (1) jurisdictional immunity (*i.e.*, a foreign state's immunity from being haled into an American court), §§ 1604–1607, and (2) attachment immunity (*i.e.*, its property in the United States is immune from "attachment arrest and execution"), §§ 1609–1611. *See generally Walters*, 651 F.3d at 286–90 (describing differences). The two components are not symmetrical. In some instances, FSIA "creates a right without a remedy" by allowing citizens to secure judgments against foreign states but not to seize assets to satisfy those judgments. *Id.* at 286–90 (criticizing policy); *Peterson*, 627 F.3d at 1128 (noting that "the exceptions to immunity from execution are more narrow than the exceptions from immunity from suit" because Congress intended "foreign states to voluntarily comply with U.S. court judgments"); *Heiser*, 807 F.Supp.2d at 12–16, 18–19, 25–26 (same).

Historically, countries retained jurisdictional and attachment immunity for " 'sovereign or public acts (*jure imperii* ),' " but FSIA eliminated immunity for a foreign state's " 'private acts (*jure gestionis* ),' "

**16.** *E.g.* 28 U.S.C. § 1606 (punitive damages), § 1608 (service), § 1610 attachment. Most of the differences disappear in terrorism-related lawsuits. *E.g.*, §§ 1605A, 1610(a)(7), (b)(2), (f), (g) & note (TRIA).

**17.** The Ninth Circuit held that MOD is not an "agency or instrumentality" of a foreign state. *MOD*, 495 F.3d at 1034–36 (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C.Cir.1994) (a country's air force performs the inherently sovereign act of providing military defense; by contrast, an agen-

cy carries out private functions, such as commerce)); *see generally Garb*, 440 F.3d at 589–95 & nn. 14, 17, 19 (explaining core functions test in relation to power to wage war). As a result, Lien Claimants cannot rely on the companion exception from attachment immunity in § 1610(b)(2) (allowing attachment of assets "of an agency or instrumentality *engaged* in commercial activity" regardless of whether the property is or was involved in the creditors' underlying cause of action) (emphasis added).

which primarily means a country's commercial activities.[18] *MOD*, 495 F.3d at 1034 (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 690–91, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004)); *e.g.*, 28 U.S.C. § 1602 (describing international law), § 1603(d) (defining commercial activity), § 1609 (attachment immunity except as provided by statute); *see generally Saudi Arabia*, 507 U.S. at 360, 113 S.Ct. 1471 ("a state engages in commercial activity ... where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns"); *Garb*, 440 F.3d at 585–88 (describing history of sovereign immunity and commercial activity exception).

More recently, Congress has responded to acts of international terrorism by removing jurisdictional and attachment immunity from foreign states that injure or kill United States citizens. *See generally In re Islamic Republic of Iran Terrorism Litig.*, 659 F.Supp.2d 31, 35, 49–58 (D.D.C. 2009) (describing Congress' response to efforts by victims to enforce default judgments against Iran); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 59 (D.D.C.2003) (in 1996, Congress lifted immunity for sovereign acts of terrorism "that are repugnant to the United States and the international community").

" 'Those nations that operate in a manner inconsistent with international norms should not expect to be granted the privilege of immunity from suit, that is within the prerogative of Congress to grant or withhold.' " *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 106 (D.D.C.2000) (quoting *Daliberti v. Republic of Iraq*, 97 F.Supp.2d 38, 50–52 (D.D.C.2000)).

Over time, many plaintiffs successfully sued Iran for its sponsorship of violent terrorism. The long break in foreign relations, however, meant that Iran had few assets in the United States to satisfy the backlog of judgments. By 2009, Iran faced "billions of dollars in liability" for the injuries caused by its state sponsorship of terrorist activities, yet "the prospects for recovery are virtually nonexistent." *Iran Terrorism Litig.*, 659 F.Supp.2d at 58 (citing OFAC's Terrorist Assets Report of $9.6 billion in outstanding judgments against Iran but less than $55 million in known blocked and unblocked financial assets in the United States). Congress frequently amended the immunity statute in an attempt to remedy this situation. Jennifer K. Elsea, Suits Against Terrorist States by Victims of Terrorism 2–3, 6–8, 17, 51, 98–102 (Beatrice V. Mohoney, ed., 2009). Lien Claimants' motion to attach relies on two of those modern amendments to FSIA: (1) TRIA, enacted in 2002, and (2) § 1610(g), added in 2008.[26]

---

**18.** The Ninth Circuit held that MOD has not "used" the Cubic Judgment for a "commercial activity," for example, by using it as security on a loan. *MOD*, 495 F.3d at 1036–37. Instead, "Iran intends to send the proceeds back to Iran for assimilation into MOD's general budget." *Id.* at 1037. The Ninth Circuit acknowledged that MOD engaged in commerce in 1977 when it entered the contracts to buy the ACMR from Cubic. The Court held, however, that the focus must be on the use of the asset in question. It found that the nexus was too attenuated to allow the Cubic Judgment to be attached based on the source of the funds. *MOD*, 495 F.3d at 1036–37. Consequently, the Ninth Circuit held that the Cubic Judgment cannot be attached pursuant

to the § 1610(a)(7) exception for a foreign state's commercial activity. *See supra* footnote 17 (discussing commercial activity exception for an agency or instrumentality).

Conversely, courts have not allowed terrorism victims to attach diplomatic properties under any subsection of § 1610. *E.g., Bennett v. Islamic Republic of Iran*, 604 F.Supp.2d 152 (D.D.C.2009), *aff'd*, 618 F.3d 19 (D.C.Cir. 2010).

**26.** In 1998, Congress amended FSIA to add § 1610(f) to allow terrorism victims to attach property "regulated" by the Departments of State and Treasury in connection with financial sanctions against foreign governments. Omnibus Consolidated & Emergency Supple-

### 1. *Terrorism Risk Insurance Act of 2002*

In 2002, Congress enacted the TRIA in an effort to further assist victims of terrorism collect compensation from hostile foreign actors. Pub. L. No. 107–297, § 201, 116 Stat. 2322 (Nov. 26, 2002); *e.g.,* 148 Cong. Rec. H. 6133, 6135–36 (2002) (remarks of Mr. Grucci, Mr. Oxley, Mr. Baker, & Mr. Watt); 148 Cong. Rec. H 6649, 6655 (2002) (remarks of Mr. Fossella); H.R. 107–779 (Nov. 13, 2002) (joint explanatory statement of the committee of conference); *see Heiser,* 807 F.Supp.2d at 12–16, 18–19, 25–26 (surveying "complex regime" of laws that "unfortunately, more often prevented ... FSIA plaintiffs from enforcing judgments"); *Hausler,* 740 F.Supp.2d at 535–36 (the remedial purpose of TRIA to comprehensively address frustration of terrorism victims unable to en-

force judgments is plain on face of statute and supported by legislative history). TRIA is codified as a note following FSIA § 1610 and currently states:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], *in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism* or which a terrorist party is not immune under 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, *the blocked assets of that terrorist party* (including the blocked assets of any agency or instrumentality of that terrorist party) *shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages* for which

---

mental Appropriations Act, Pub. L. 105–277, div. A, tit. I § 117, 112 Stat. N81 (Oct. 21, 1998). The Executive branch had identified and seized billions of dollars of foreign assets as part of its foreign policy negotiations. Congress wanted terrorism victims to have first right to those funds as a way to punish sponsors of terrorism. *E.g.,* 146 Cong. Rec. Hg6963, 6937 (date) (remarks of Mr. Chabot describing circumstances).

Congress, however, acknowledged that the President needed flexibility to manage complex diplomatic relationships. Congress thus included a provision that allowed the President to "waive" § 1610 *Id.,* § 117(d); *accord* Victims of Tracking and Violence Protection Act of 2060, Pub. L. 106–386, div. C, § 2002(f) 114 Stat. 1464 (Oct. 28, 2000). President Clinton immediately determined that national security interests would be impaired if those assets were redirected to satisfy terrorism-related judgments and invoked his power to waive the regulated-assets exception. 63 Fed.Reg. 59201 (Oct. 21, 1998) (Presidential Determination No. 99–1); *accord* 65 Fed.Reg. 66483 (Oct. 28, 2000) (Determination to Waive Attachment Provisions Relating to Blocked Property of Terrorist–List States).

Despite criticism, the Presidential waiver remains in place. *E.g., Hausler v. JP Morgan Chase Bank, N.A.* 740 F.Supp.2d 525, 538 n. 13 (S.D.N.Y.2010)(citing 148 Cong.Rec. S 11528); *Flatow v. Islamic Republic of Iran,* 76 F.Supp.2d 16, 19, 25–27 (D.D.C.1999) (President "intervened to forestall plaintiff Flatlow's ability to satisfy his judgment" when Congress gave the Executive that flexibility in "the oft-sensitive area of foreign relations"); H.R.Rep. No. 11–844, 2008 WL 4211130 at *6 (Sept. 15, 2008) ("While Congress has supported giving terrorism victims the right to obtain relief and to enforce judgments, the Executive Branch has been less supportive."). Consequently, the Ninth Circuit recognized that the regulated-assets exception to attachment immunity is not a viable option, even for those who hold terrorism-related judgments. *MOD,* 495 F.3d at 1031–32 n. 8 (holding hat the enactment of TRIA in 2002 did not "reinvigorate 1610(f)(a)(A) from President Clinton's waiver"); *accord Bennett,* 604 F.Supp.2d at 161 (stating that § 1610(f) "remains a nullity"). Thus, even though the Cubic Judgment is regulated by an OFAC license, the Lien Claimants cannot rely on § 1610(f).

such terrorist party has been adjudged liable.

28 U.S.C. § 1610 note (emphasis added).[27] Congress thereby expanded the ability of victims of terrorism to reach beyond commercial property to attach property frozen by a financial sanction. *See generally Iran Terrorism Litig.*, 659 F.Supp.2d at 57–58 (describing TRIA); Elsea, *supra,* at 6–8, 17. The term "blocked asset" means "any asset seized or frozen by the United States under ... the International Emergency Economic Powers Act (50 U.S.C. § 1701, 1702)...." *Id.* (2)(A). TRIA directs that such assets "shall be subject to" attachment "notwithstanding any other provision of law." § 1610 note.

▮ The term "terrorist party" includes a foreign state designated as a state sponsor of terrorism under the Export Administration Act of 1979. *Id.* The Secretary of State designated Iran as a country that has repeatedly provided support for acts of international terrorism pursuant to the Export Administration Act. 50 U.S.C.App. § 2405(j); 31 C.F.R. § 596.201 (2013); *accord* Arms Export Control Act, 22 U.S.C. § 2780; 22 C.F.R. § 126.1(d) (2013); Foreign Assistance Act of 1961, 22 U.S.C. § 2371(a). Iran has been so designated since 1984 and that designation remains in place. 49 Fed.Reg. 2836–02 (Jan. 23, 1984); *MOD,* 495 F.3d at 1032; *Reed,* 845 F.Supp.2d at 211; *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 9 (D.D.C. 1998).

### 2. *2008 Amendment Adds § 1610(g)*

In 2008, Congress made several changes to FSIA to enhance the remedies for terrorism victims. One significant change was to strengthen the terrorism exception to a foreign state's jurisdictional immunity. As discussed above, Congress replaced § 1605(a)(7) with § 1605A to improve access to federal court and the available remedies. National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110–181, div. A, tit. X, § 1083(b)(3), 122 Stat. 3 (Jan. 28, 2008); *see generally Iran Terrorism Litig.,* 659 F.Supp.2d at 36–41, 58–62 (describing improvements, such as permitting recovery of punitive damages); Elsea, *supra,* at 38–46, 99; *see supra* page 6.

In a second important change, Congress added § 1610(g) to expand the power of victims of state-sponsored terrorism to attach any property in the United States as long as the foreign state has "simple ownership" of the asset. 28 U.S.C. § 1610(g); *e.g.,* 154 Cong. Rec. S54–01, 2008 WL 182982 (Jan. 22, 2008) (remarks of Senator Lautenberg); H.R. Rep. 110–844, 2008 WL 4211130 at *8–9; *Heiser,* 807 F.Supp.2d at 25–26 ("in crafting the broad remedial language of § 1610(g), Congress made no exceptions to its reach"); *Calderon–Cardona v. Democratic People's Republic of Korea,* 723 F.Supp.2d 441, 458 (D.P.R.2010) (stating that § 1610(g) "significantly eases enforcement of judgments entered under section 1605A"); Elsea, *supra,* at 41–44, 99–101.

---

27. The exception in subsection (b) gives the President the power to waive certain assets in the interest of national security *Id.;* Elsea, *supra,* at 17. This provision allows the Executive branch the flexibility to mange complex diplomatic efforts. *See Dames & Moore,* 453 U.S. at 673, 101 S.Ct. 2972. This provision is not at issue in this case as the Executive branch supports the Lien Claimants' efforts to attach the Cubic Judgment.

When Congress enacted TRIA in 2002, the terrorism exception to jurisdictional immunity was codified as § 1605(a)(7). In 2008, when Congress substituted § 1605A, it neglected to update this reference; however it corrected that discrepancy in 2012. Pub. L. 112–158, tit. V, § 502(e)(1)(A), 126 Stat. 1214 (Aug. 10, 2012).

## III. ANALYSIS

### A. The Algiers Accord

#### 1. The Algiers Accord Does Not Prevent Attachment because MOD's Interest in the Asset in Question Arose after November 14, 1979

■■ MOD argues that distribution of the Cubic Judgment to the Lien Claimants would violate the United States' foreign policy obligations in the Algiers Accord. MOD contends that the Court should give full effect to that Executive Agreement and consider the imperative importance of maintaining the United States' compliance with its international commitments. *Dames & Moore*, 453 U.S. at 660, 673, 101 S.Ct. 2972; *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). The United States obligated itself to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979." MOD's Request for Judicial Notice, Ex. A. The purpose of the Algiers Accord was to retain the status quo of Iran's financial position *before* President Carter froze Iran's assets to punish the taking of American hostages. MOD argues that, prior to November 14, 1979, Iran's financial position included the amount of the ICC's Final Award on the Cubic contracts. According to MOD, the fund now held by this Court constitutes the net value of MOD's property rights in the military equipment, or alternatively, the monetary value of the contracts.

MOD grounds its argument on events that predate November 14, 1979. By late 1978, MOD had made significant payments on the sales contract ($12 million of the $17 million purchase price). By early 1979, Cubic had substantially completed building the ACMR and had secured an export license. Moreover, before the hostages were seized, the parties mutually agreed to modify the contracts and settle accounts later. *Elahi*, 556 U.S. at 372, 129 S.Ct. 1732. Cubic's subsequent breach of that agreement—by failing to remit to MOD the proceeds of the 1982 sale of the ACMR to Canada—does not alter those basic facts. According to MOD, these facts establish its ownership interest by the date established in the Algiers Accord.

MOD further argues that those facts establish a legal right to the Cubic Judgment under Iranian law.[28] Iranian law governs the interpretation of the Cubic contracts. MOD states that Iranian law created an enforceable property right in 1977 (when MOD signed the contracts) or alternatively in 1978 (when the ACMR was produced under the terms of the contracts). *See* MOD's Request for Judicial Notice, Ex. F. Thus, MOD argues that the Cubic Judgment falls within the Algiers Accords as part of Iran's financial position that existed before November 14, 1979.

Consequently, MOD argues the Lien Claimants cannot attach the Cubic Judgment because the United States must honor its agreement and restore Iran to its pre–1979 financial position by ensuring the transfer of the $2.8 million award (plus accrued interest) to MOD (into a blocked bank account as required by current sanctions). *Dames & Moore*, 453 U.S. at 660, 101 S.Ct. 2972.

The Court holds that the Algiers Accord does not bar the attachment of the Cubic Judgment in light of the United States Supreme Court's decision in *Elahi*, 556 U.S. 366, 129 S.Ct. 1732.[29]

28. MOD also argues that United States law recognizes that Iran's ownership interest in the Cubic–Judgment predates November 14, 1979. MOD relies on the Department of Treasury regulations implementing the Algiers Accord, specifically, 31 C.F.R. § 535.540.

The Court addresses this separate argument in the next section.

29. For an example of an action that did impair the United States' commitments to uphold the Algiers Accords see the cases filed by former hostages. *Roeder v. Islamic Republic*

There, in an earlier appeal by a different lien claimant seeking to attach under TRIA, the Supreme Court held that Iran's interest in the Cubic Judgment *or* "the property that underlies" it first arose in October 1982. In *Elahi*, the Supreme Court emphasized that attachment depends upon properly identifying the "asset in question." *Id.* at 376, 129 S.Ct. 1732. The asset in question is the Cubic Judgment enforcing the arbitration award—not Iran's interest in the ACMR, not MOD's right to pursue its legal remedies for breach of the 1977 contracts, and not the ICC's Final Award in favor of MOD.[30] *Id.* The Supreme Court found, at the earliest, that Iran's interest in the Cubic Judgment *itself* arose in 1998 when the district court confirmed the arbitration award. *Id.* The Supreme Court also acknowledged that Iran's interest could be characterized as "the property that underlies the Cubic Judgment," namely, the *proceeds* from the sale of the ACMR to Canada. *Id.* at 376–77, 129 S.Ct. 1732. In that regard, the Supreme Court determined that Iran's claim to the proceeds of the military equipment contract arose, at the earliest, in October 1982, when Cubic was able to "reasonably, comprehensively, and precisely account" for the results of the agreement to resell the system to Canada. *Id.* at 376–77, 129 S.Ct. 1732. Until the sale to the third party was accomplished, the amount of restitution, if any, could not be determined because Cubic was entitled to its expenses, a reasonable profit, and other compensation. *Id.* (citing ICC Final Award). The resale to Canada in 1982 was essential to transforming Iran's inchoate claim into a tangible, attachable asset.

This analysis defeats MOD's defense to the instant motion. Applying the *Elahi* analysis, "prior to November 14, 1979" (the date identified in the Algiers Accord), it was *uncertain* whether Iran *or* Cubic would be entitled to financial compensation on the contracts. *See id.* at 376, 129 S.Ct. 1732. Hence, for the purpose of deciding the Lien Claimants' motion to attach, Iran's interest in the Cubic Judgment arose three years *after* the critical date for applying the Algiers Accord. Consequently, the Algiers Accord is not an obstacle to the relief sought by the Lien Claimants.

■ The United States supports this decision. In its Statement of Interest, the United States contends that "[n]othing in the Algiers Accords would prohibit the attachment of Iran's 1999 monetary judgment in this case." Doc. No. 277 at 10. The government's interpretation of its own agreement is entitled to "great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 & n. 10, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *see Altmann*, 541 U.S. at 702 & n. 23, 124 S.Ct. 2240 (courts defer to Executive branch's opinion on issue of foreign policy in particular cases); *United States v. Lombera–Camorlinga*, 206 F.3d 882, 887 (9th Cir.2000) (en banc) (courts ordinarily respect State Department's interpretation of a treaty that it negotiated); *Estate of Heiser v. Islamic Republic of Iran*, 885 F.Supp.2d 429, 441 (D.D.C.2012) (giving weight to Statement

of Iran, 333 F.3d 228 (D.C.Cir.2003) (holding hostages could not sue Iran because Algiers Accord contained express provision prohibiting lawsuits arising out of hostage-faking); Elsea, *supra*, at 21–25.

**30.** The distinction is sound. The military equipment cannot be the asset because it is no longer in the United States, having been sold and shipped to Canada in 1982. Neither the

right to sue for an unascertainable amount of contract damages nor a final arbitration award can be attached. *E.g.,* Cal. Civ. P. § 483.010(a); *Jordan–Lyon Prods., Ltd. v. Cineplex Odeon Corp.,* 29 Cal.App.4th 1459, 35 Cal.Rptr.2d 200, 207 (1994). By contrast, a court judgment enforcing an arbitration award is an asset that supports a lien. *E.g., Jordan–Lyon,* 35 Cal.Rptr.2d at 207.

of Interest by Executive Branch on issue of foreign policy).

Consequently, the Court holds that the Algiers Accord does not prevent the Lien Claimants from attaching the Cubic Judgment.

## 2. *Treasury Regulation 31 C.F.R. § 535.540(f)*

■ MOD also contends that United States law recognizes Iran's ownership of the proceeds of the sale of the ACMR to Canada, even if realized after 1981. MOD argues that the proceeds of the ACMR sale are governed by 31 C.F.R. § 535.540(f) (defining "[t]he proceeds of [a] sale" as "property"). MOD contends this federal regulation requires the monies interpleaded by Cubic to be returned to Iran in accordance with the Algiers Accord.

MOD observes that the Supreme Court construed TRIA in relation to Treasury regulation 31 C.F.R. § 535.579 in order to review the Ninth Circuit's decision on the general license. *See Elahi*, 556 U.S. at 376–77, 129 S.Ct. 1732; *MOD*, 385 F.3d at 1214. MOD now relies on a different section of the IACR. The Supreme Court did not address the requirements of § 535.540, therefore, MOD contends that the *Elahi* decision is not necessarily inconsistent with its current position.

The Department of Treasury enacted § 535.540 in July 1982 to handle situations where exporters, purchasing agents, or other Americans were holding tangible property that could not be transferred to Iran due to the freeze, but the property might deteriorate, decline in value, or incur expensive storage costs. 47 Fed.Reg. 31682 (July 22, 1982). The regulation created a new licensing procedure to allow the goods to be sold at a public auction. In particular, the regulation governed "tangible properties as to which Iran did not possess complete or uncontested ownership rights under applicable provisions of U.S. law because of failure to pay the purchase price and other related charges." *Id.* Upon deducting reasonable costs, the licensee was required to deposit the contested funds into a "separate blocked, interest-bearing account at a domestic bank." § 535.540(d); *see* § 535.333(c) (stating that Iran's property interests can be considered "contested" if there is a reasonable belief and the opinion of an attorney "that Iran does not have title or has only partial title to the asset"). Nonetheless, the regulation required that Iran's uncontested share of the proceeds of such a sale to be transferred to Iran as promised in the Algiers Accords. § 535.540(f).

MOD contends that this regulation shows that United States law recognizes Iran's ownership of the ACMR system or the resale proceeds by the date of the Algiers Accord. MOD attempts to demonstrate that the regulation applies because (1) the ACMR was tangible property that President Carter blocked on November 14, 1979 and (2) Cubic contested ownership of the asset.[31] "If Iran had a share in the

---

**31.** MOD bolsters this argument by speculating that Cubic must have obtained a specific license from OFAC to sell the ACMR to Canada. 31 C.F.R. § 535.540(a); *e.g.* Kerekes Reply Decl. Ex. A (license to auction Iran's military equipment stored by Behring International, Inc.).

MOD served a subpoena on Cubic requesting a copy of the license. Doc. Nos. 285, 288. Cubic could not locate any such document. Doc. No. 289. At the hearing, MOD withdrew its request and deems the matter settled as to Cubic.

In addition, MOD asks the Court to order OFAC to produce this license. Because the United States is not a party to this case, the Court declines this request. In any event, such a license would have required Cubic to indemnify the United States for any damages awarded by the Tribunal. 31 C.F.R. § 535.540(a)(4). Assuming such a license exists, it would not advance MOD's argument in these judicial proceedings.

resale proceeds of the ACMR system, it means that it should have possessed a property interest in the asset itself in the first place, otherwise it could not have any share in the resale proceeds." MOD's Reply to U.S. at 4.

The Court is not persuaded by this argument. MOD's reliance on § 535.540 attempts to equate the funds now held by this Court either to the net value of the ACMR or to the proceeds of the sale of that military equipment to Canada. In *Elahi*, the Supreme Court rejected an analysis tied to the tangible asset of the ACMR. Instead, the Supreme Court analyzed Iran's property interest as either the Cubic Judgment itself or the proceeds of the Canadian sale. For the purpose of deciding a motion to attach, the Supreme Court identified the attached asset as one in which Iran's property interest did not arise until October 1982 at the earliest. This Court is bound by that characterization. MOD's reliance on § 535.540 fails to alter the outcome: Iran's financial interest in the attached asset arose *after* the effective date of the Algiers Accord (January 19, 1981).

Moreover, the *Elahi* decision determined that the Cubic Judgment did not have the status of a blocked asset up to the date of the Ninth Circuit's decision in mid–2007. *Elahi*, 556 U.S. at 377–78, 129 S.Ct. 1732. Instead, the Supreme Court concluded the Cubic Judgment was governed by the general license in § 535.579. *Id.* at 377, 129 S.Ct. 1732. It follows that the Cubic Judgment was not, at that time, "blocked by § 535.201" so as to require the

specific license outlined in § 535.540(a). Thus, this regulation is not relevant to the facts.

### 3. The Tribunal has Jurisdiction to Interpret the Algiers Accord and to Enforce the United States' Obligations

In addition, the Court observes that MOD's arguments concerning the Algiers Accord are directed at the United States. *E.g.*, MOD's Opp. Br. at 10–13 & n. 1; MOD's Response to United States Br. 2–6; MOD's Sur–Reply Br. at 2–7; MOD's Reply Br. at 2–6. The United States is not a party to this action. It filed a written statement as a courtesy to the Court. The Court is deciding the separate issue of whether the Lien Claimants can attach the Cubic Judgment. To the extent that MOD contends that the United States breached the Algiers Accord, the Court notes that the United States' obligations can be determined in Iran's pending Case No. B61. *See supra* footnote 15. The B61 case includes Iran's claim for compensation from the United States for military equipment owned by Iran on or before November 1979. *See MOD*, 495 F.3d at 1030–31 (distinguishing between Cubic's contractual obligations and United States' obligations). The Tribunal has jurisdiction over the United States and has the power to craft an appropriate remedy to enforce the international agreement. The Tribunal is the proper venue to resolve whether the United States' duty to "restore the financial position of Iran" under the Algiers Accord includes compensation for the ACMR.[32] The Court expresses no opinion on the merits of the dispute between Iran

**32.** In particular, the following arguments are more appropriately addressed to the Tribunal in relation to the United States' obligations to Iran.

(1) To the extent that MOD contends the United States breached it obligations to ensure the transfer of all "property" as implemented by 31 C.F.R. § 535.540(f), the Tribunal has the authority to decide if the regulation complies with United States'

commitments in the Algiers Accord. *See* MOD's Request for Judicial Notice, Ex. A ¶ 4 (noting that Tribunal held certain Treasury Regulations "unlawful" in Case No. 15); Doc. No. 85, Ex. 1 ¶ 77 (Tribunal's decision in Case No. A15 finds certain Treasury Regulations inconsistent with United States' commitments in Algiers Declarations).

and the United States in Case No. B61. *See* Doc. 277 at 11–12 (discussing setoff dispute).

## B. Lien Claimants Can Attach the Cubic Judgment under TRIA because it is a Blocked Asset on the Date of this Decision

Lien Claimants satisfy several preliminary requirements of TRIA. First, it has been established that Iran is a "state sponsor of terrorism" and a "terrorist party." *See supra* pages 1081–82. Second, the record shows that Lien Claimants seek to enforce judgments for compensatory damages for claims based on acts of terrorism. *See supra* pages 1075–77. Third, MOD does not dispute that it is liable for Iran's debts.[33] Fourth, it is undisputed that MOD received adequate notice that Lien Claimants would be seeking to attach the Cubic Judgment.[34] *See supra* pages 1075–

Case 3:98–cv–01165–B–DHB Document 302 Filed 11/27/13 Page 23 of 42

(2) MOD relies on the Tribunal's Partial Award in Case No. B61 to argue that the ICC award constitutes the net value of Iran's "financial position" as reflected either by the military equipment or the receipt of the replacement value for that asset. MOD cites the Tribunal's definition of "financial position" as "the assets and liabilities at a certain point in time." MOD's Request for Judicial Notice, Ex. D ¶¶ 143–44. The Tribunal explained that "it is only those legally enforceable rights and obligations that are capable of assessment in monetary terms that are taken into account." *Id.* Under that test, MOD argues that, before 1979, Iran's "financial position" on the Cubic contracts, "measured in monetary terms," was its "net asset position." *See id.*

(3) MOD raises an equitable argument that Iran has owned the equipment since 1978/179 once it made substantial payments and Cubic obtained the export license, and that Iran should not be punished now for Cubic's failure to timely perform its obligations and the delay caused by years of litigation. 31 C.F.R. § 535.215 (2013) (compelling all persons within United States who control Iranian assets to transfer property in compliance with Algiers Accord); 31 C.F.R. § 535.540(f). MOD argues that the United States is obligated under the Algiers Accords to "ensure" transfer of the assets back to Iran—regardless of how long it took because Iran has not been made whole for its pre–1979 financial position.

33. The Ninth Circuit determined that MOD is an inseparable part of the government of Iran. *See supra* footnote 17 (citing *MOD*, 495 F.3d at 1034–36); *accord Roeder*, 333 F.3d at 234–35 & n. 4 (a Ministry that governs the nation's armed forces is treated as "the state of Iran" and is "not legally distinct" from Iran). Therefore, all sums owed to MOD are owed to Iran itself.

In any event, TRIA and 1610(g) permit terrorism-based judgments to be satisfied by assets of a "juridically distinct" entity, thereby increasing the scope of assets subject to execution to satisfy Iran's liability. *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48–49 (2d Cir.2010), *cert. denied* —— U.S. ——, 133 S.Ct. 21, 183 L.Ed.2d 675 (2012); *Bennett v. Islamic Republic of Iran*, 927 F.Supp.2d 833, 841–42 & n. 9 (N.D.Cal.2013) (holding that TRIA and § 161d(g) abrogate the *Bancec* doctrine terrorism-based judgments); *cf. First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("*Bancec* ") (holding that a private trading bank, partially owned and controlled by the foreign government with "separate juridical status," is immune from suit based on actions taken by that government; however, affirming district court's finding that Ministry of Foreign Trade is a member of and "no different than" the Government of Cuba).

34. The Court has an independent duty to ensure that the requirements of FSIA have been met. *Walters*, 651 F.3d at 290 (collecting cases including the Ninth Circuit's decision of *Peterson*, 627 F.3d at 1126–29). Although the docket on PACER discloses potential problems with service in Rafii's District of Columbia action, *see supra* footnote 11, MOD does not and cannot claim that it lacked adequate notice of her lien. *Cf.* 28 U.S.C. § 1610(c) (notice required for attachment under § 1610(a) or (b)); *see Rubin*, 637 F.3d at 799–801; *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 798 F.Supp.2d 260, 266–70

77. The only dispute is whether the Cubic Judgment is a blocked asset under TRIA on the date of this decision. *Elahi*, 556 U.S. at 368, 376, 377, 387, 129 S.Ct. 1732.

 The Court agrees with Lien Claimants that the Cubic Judgment is a blocked asset under two separate federal laws: (1) Executive Order 13599 and (2) the Weapons of Mass Destruction Proliferators Sanctions regulations. Consequently, MOD's property, the Cubic Judgment, is not immune from execution of the Lien Claimants' District of Columbia terrorism-related judgments.

### 1. *President Obama's February 2012 Executive Order*

First, the Court concludes that the Cubic Judgment satisfies the definition of a blocked asset based upon President Obama's Executive Order 13599 freezing "[a]ll property and interests in property of the Government of Iran" that are subject to the jurisdiction of the United States. 77 Fed.Reg. 6659 (Feb. 8, 2012). It became effective in February 2012 and remains in effect today. 77 Fed.Reg. 7660 (Feb. 13, 2012). This recent Executive Order blocked all Iranian property interests, including those of its political subdivisions such as MOD, pursuant to the IEEPA. 77 Fed.Reg. at 6660 § 7(d); 31 C.F.R. pt. 560 (2013) (Iranian Transactions and Sanctions Regulations).

The United States supports this interpretation of the Executive Order. Doc. No. 277 at 8; *accord* Doc. No. 203, Ex. C (OFAC License describes Cubic Judgment as blocked asset under Executive Order

13599); *see also Heiser*, 885 F.Supp.2d at 441 ("Courts have traditionally accorded some weight to the views of the Executive Branch" regarding blocked assets in foreign policy arena).

In opposition, MOD argues that Executive Order 13599, by its terms, does not apply to property first blocked by President Carter's Executive Order 12170 (November 14, 1979) but thereafter made subject to the transfer directives of the Algiers Accords as implemented by Executive Order 12281 (January 19, 1981). 77 Fed.Reg. at 6660 § 4(b). In short, President Obama made an exception for property covered by the Algiers Accord. MOD repeats its contention that attachment of the Cubic Judgment breaches the United States' treaty obligations because those funds must be restored to Iran as part of its pre–1979 financial position.

For the same reasons discussed above, the Court is not persuaded. *See supra* pages 1083–87 (citing *Elahi*, 556 U.S. at 375–77, 129 S.Ct. 1732). Accordingly, the Court finds that the Cubic Judgment is blocked by Executive Order 13599 and its implementing regulations. Therefore, TRIA allows those who hold judgments related to Iran's terrorist activities to attach the Cubic Judgment.

### 2. *Weapons of Mass Destruction Proliferators Sanctions Regulations*

Second, the Cubic Judgment is a "blocked asset" pursuant to Executive Order 13382 which pertains to the proliferation of weapons of mass destruction (including nuclear, biological, and chemical

(D.D.C.2011); *Murphy v. Islamic Republic of Iran*, 778 F.Supp.2d 70, 72 (D.D.C.2011); *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 66–67 (D.D.C.2010). As noted, MOD's counsel in this action was served with both liens many years ago. Doc. Nos. 124, 130, 144 & 145. Each notice included a copy

of the District of Columbia default judgment. *Id.* Further, MOD availed itself of its right to respond to this motion. Finally, because MOD is an inseparable part of the Iranian government, Iran is deemed to have received actual notice of the liens. *Peterson*, 627 F.3d at 1129; *see supra* footnote 17.

weapons). Pursuant to the IEEPA, the Executive Order blocks the property of any foreign person engaged in or attempting to engage in the production of such weapons. Executive Order 13382; 70 Fed. Reg. 38567 (June 28, 2005). In 2007, the Department of State designated MOD as supporter of and actor involved with the production of weapons of mass destruction. 72 Fed.Reg. 71991, 71992 (Dec. 19, 2007). The accompanying Weapons of Mass Destruction Proliferators Sanctions ("WMDPS") regulations operate broadly to block "all property and interests of property that are in the United States" of the designated entities. 31 C.F.R. §§ 544.201(a), 544.301 (2013); 74 Fed.Reg. 16771–01 (Apr. 13, 2009).

The United States supports this interpretation. Doc. No. 277 at 7–8; *accord* Doc. No. 203, Ex. C (OFAC License describes Cubic Judgment as a blocked asset under 31 C.F.R. pt. 544); *see also Heiser*, 885 F.Supp.2d at 441 (courts give some weight to Executive Branch's views on foreign policy issues).

The Court holds that the Cubic Judgment is a blocked asset within the definition of TRIA pursuant to the designation of MOD as a proliferator of weapons of mass destruction.

MOD raises two objections to the application of the WMDPS regulations. MOD first argues that the designation applies to the "Ministry of Defense and Armed Forces Logistics" ("MODAFL"). MOD argues that the designation does not extend to the distinct entity of the "Ministry of Defense and Support for the Armed Forces," the entity awarded the Cubic Judgment.

The Court agrees with the United States that MOD cannot evade the designation based on a minor discrepancy in the translation of the Ministry's name. Doc. No. 277 at 8. The Department of State interprets its regulation referring to "MO-DAFL" to apply to MOD. *See* 72 Fed Reg. 71991–02 (Dec. 19, 2007) (listing both MO-DAFL and MODSAF as designees). That reasonable interpretation is not clearly erroneous and thus controls. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations omitted); *see also Heiser*, 885 F.Supp.2d at 441.

■ MOD's second objection is that a regulation prohibits the use of the Cubic Judgment to satisfy the Lien Claimants' request. The regulation is entitled: "Payments from blocked accounts to satisfy obligations prohibited." 31 C.F.R. § 544.407 (2013). It states: "Pursuant to § 544.201, no debits may be made to a blocked account to pay obligations to U.S. persons or other persons, except as authorized by or pursuant to this part." *Id.* MOD argues this regulation bars Lien Claimants from attaching the Cubic Judgment because the funds are held by the Clerk of the Court in a "blocked account"; consequently, no debit can be made to satisfy MOD's obligation to Lien Claimants, who are "U.S. persons."

The Court agrees with the Lien Claimants' analysis of the regulation. This regulation simply lists one of many ways the United States prevents anyone from making any type of transaction to transfer, pay, export, withdraw, or otherwise deal with designated entities except as set forth in the WMDPS regulations. *Id.* § 544.201; *e.g., id.* § 544.405 (prohibiting the performance of services including accounting, financial, brokering, freight forwarding, transportation, or public relations), § 544.406 (prohibiting transfers through an offshore transaction), § 544.409 (prohibiting transfer via charge cards, debit cards, or credit agreements), § 544.410 (prohibiting taking a setoff against blocked property). The "debit" restriction immobilizes a designated entity's assets within the jurisdiction of the United States in every possi-

ble manner. Taken in context, the Court interprets the regulation as preventing designated parties from circumventing the sanction by having a third party take funds from a blocked account to satisfy a debt. The regulation thus prohibits indirect, concealed access to frozen funds by creditors as well as direct, undisguised access by the designated entity itself.

Moreover, MOD's reliance on § 544.407 is inconsistent with the policy of TRIA to empower terrorism victims to attach blocked assets. *See supra* pages 1080–82 and *infra* pages 1093–94 & 1095–96. Even if MOD correctly reads § 544.407 so that it conflicts with TRIA, the regulation would be barred by the "[n]otwithstanding any other provision of law" language in FSIA. 28 U.S.C. § 1610 note, § (a). The Court concludes that this vague regulation does not override the statute that specifically allows holders of terrorism-related judgments "in every case" to attach "blocked assets" to obtain compensation. *Id.; see United States v. Maes,* 546 F.3d 1066, 1068 (9th Cir.2008) ("a regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides"); *United States v. Doe,* 701 F.2d 819, 823 (9th Cir.1983) ("Where an administrative regulation conflicts with a statute, the statute controls.") (citations omitted).

Lien Claimants correctly observe that TRIA does not permit execution *unless* the account has the status of being frozen. *See Rubin,* 709 F.3d at 54 (assets must be " 'blocked' to fall within TRIA's scope"); *Smith v. Fed. Reserve Bk. of NY,* 346 F.3d 264, 271 (2d Cir.2003) (TRIA's plain language gives "terrorist victims who actually receive favorable judgments a right to execute against assets that would *otherwise* be blocked") (emphasis added). In light of that reality, it would not make sense for § 544.407 to prevent attachment by victims of terrorism.

Finally, OFAC issued a license to the Cubic Judgment that permits the Court to distribute these funds pursuant to TRIA. Doc. No. 203, Ex. C. The Department of Treasury's OFAC thus implicitly interprets its own WMDPS regulations to permit the Lien Claimants to attach this asset. *See City of Seattle v. FERC,* 923 F.2d 713, 716 (9th Cir.1991) (courts show deference to agency's sensible reading of a license); *Heiser,* 885 F.Supp.2d at 441 (deferring to Executive Branch's interpretation of TRIA in light of important role that blocked assets play in foreign policy); *e.g., Heiser v. Bank of Tokyo Mitsubishi UFJ,* 919 F.Supp.2d 411, 422–23 (S.D.N.Y. 2013) (allowing distribution of funds to victims pursuant to TRIA of assets blocked by WMDPS without an OFAC license).

In sum, the Court rejects MOD's regulatory defense to attachment.

### 3. *MOD Does Not Have a Defense to Attachment under TRIA*

In its effort to defeat the straightforward application of TRIA, MOD raises three other arguments. Each argument fails.

### a. *The Algiers Accords Does Not Bar this TRIA Motion*

MOD reframes its reliance on the Algiers Accord. MOD contends that the Court must interpret TRIA consistent with the United States' treaty obligations. *MacLeod v. United States,* 229 U.S. 416, 434, 48 Ct.Cl. 512, 33 S.Ct. 955, 57 L.Ed. 1260 (1913) (when construing a statute, "it should not be assumed that Congress proposed to violate the obligations of the country to other nations"); *Chew Heong v. United States,* 112 U.S. 536, 550, 5 S.Ct. 255, 28 L.Ed. 770 (1884); *Murray,* 6 U.S. at 118 ("an act of Congress ought never to be construed to violate the law of nations if any other construction remains"). This concept applies to executive agreements like the Algiers Accord. *Dames & Moore,*

453 U.S. at 660, 679–86, 101 S.Ct. 2972. MOD argues that "[w]hether viewed as a presumption as to congressional intent, a rule of inadvertent repeal, or a vindication of comity, the canon's principle objective is to ensure the integrity of United States' obligations under international agreements." Br. at 15.

MOD argues that the competence of the Tribunal should not be undermined because the United States agreed to settle claims in that forum. The facts show that both Iran and the United States recognize that the Cubic contracts are at issue in the Tribunal. Br. at 13–14 n. 2. MOD asserts that Lien Claimants should not impede the bargaining powers of the President to "block" assets as part of his diplomatic efforts. *Dames & Moore,* 453 U.S. at 673, 101 S.Ct. 2972. It argues the Court should defer to the President's power to handle foreign policy negotiations with Iran rather than allow Lien Claimants to collect. MOD argues that any interpretation of TRIA that permits the Lien Claimants to attach the Cubic Judgment should conform to the United States' obligations under the Algiers Accords to restore Iranian property to Iran. MOD argues that granting the attachment motion would render the United States in default of the Algiers Accord.

The Court is not persuaded by MOD's argument. Congress expressly allows victims of terrorism to attach assets under TRIA "notwithstanding any other provision of law." 28 U.S.C. § 1610 note; *see Weinstein,* 609 F.3d at 53–54 (rejecting a bank's reliance on the 1955 Treaty of Amity between Shah of Iran and United States because TRIA "trumps" all other laws). This clear statement permits the Lien Claimants to attach any asset that is, at present, blocked as defined by United States law. *See Cisneros v. Alpine Ridge Grp.,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (use of a "notwith-

standing" clause "clearly signals" intent to "override conflicting provisions") (collecting cases); *United States v. Novak,* 476 F.3d 1041, 1046–47 (9th Cir.2007) (en banc) (generally, a "notwithstanding" clause in a statute signals Congress' clear intent to supercede any previously enacted conflicting laws) (collecting cases); *cf. Roeder,* 333 F.3d at 237–38 (if Congress had enacted a "notwithstanding" provision to allow hostages to sue Iran, the language might abrogate the Algiers Accords promise to the contrary).

**b. *The Iranian Assets Control Regulations Do Not Prevent Attachment of the Cubic Judgment***

In 1979, the Department of Treasury issued the Iranian Assets Control Regulations ("IACR") to implement President Carter's order to block assets, and then amended them in 1981 to implement the Algiers Accord. *See generally Weinstein,* 299 F.Supp.2d at 65–68 (describing regulations before and after hostage crisis settled); *Security Pacific National Bank v. Islamic Republic of Iran,* 513 F.Supp. 864 (C.D.Cal.1981) (same); MOD's Request for Judicial Notice, Ex. E (describing OFAC's implementation of sanctions against Iran and the Algiers settlement); *see supra* pages 1077–78.

As a defense to attachment, MOD cites the general license authorizing "new transactions concerning certain Iranian property." 31 C.F.R. § 535.579 (2013). This regulation authorizes "[t]ransactions involving property in which Iran or an Iranian entity has an interest" either when the property came within the jurisdiction of the United States or when Iran's interest in the property arose "*after* January 19, 1981." *Id.* § 535.579(a) (emphasis added). Thus, if the Court finds that Iran's interest in the Cubic Judgment arose in October 1982 upon the sale of the ACMR to Canada, MOD contends that Iran is

entitled to the money because its interest arose after January 19, 1981. *See Elahi,* 556 U.S. at 377, 129 S.Ct. 1732 ("we must conclude that October 1982 is the time when Iran's claim to proceeds arose"). Under MOD's analysis, the Cubic Judgment is not a blocked asset because it falls within the general license covering Iran's property interests that arose after January 19, 1981. *Id.* § 535.579(a).

The Court is not persuaded by this interpretation of the regulation. MOD takes the language out of context. The "new transactions" regulation was enacted in 1981 to implement the hostage release agreement with Iran by lifting the freeze on Iranian assets that President Carter *previously* imposed in 1979. 46 Fed.Reg. 14336 (Feb. 26, 1981); *see generally Dames & Moore,* 453 U.S. at 662–73, 101 S.Ct. 2972. Effective January 19, 1981, § 535.579 merely states that "new transactions" with Iran were now permitted (within the confines of the IACR). The clear intent of this 1981 general license was to authorize *future* transactions of Iranian assets that were not entangled with the Algiers Accord. *See Weinstein,* 299 F.Supp.2d at 67 ("To implement EO 12282, the OFAC repealed certain provisions of the IACR and promulgated a 'general license' authorizing transactions with Iran, codified at 31 C.F.R. § 535.579.") (footnote omitted); MOD's Request for Judicial Notice, Ex. E ¶¶ 15–16 (Decl. of OFAC Director Newcomb describes general license in § 535.579); *cf. Dames & Moore,* 453 U.S. at 669–74, 101 S.Ct. 2972 (holding IEEPA authorized President to enforce Algiers Accord by nullifying a creditor's prejudgment attachment and ordering transfer of asset to Iran).

More importantly, MOD's position ignores recent sanctions. MOD oversimpli-fies the analysis by equating a transaction permitted by the general license set forth in IACR § 535.579 with an "unblocked asset" in every respect. *Weinstein,* 299 F.Supp.2d at 74–76 (TRIA defines "blocked assets" as those "seized or frozen," not "as an 'omnibus' term extending to all assets 'regulated' or 'licensed' by the OFAC"). MOD's position might have had merit if it had been made anytime between January 19, 1981 and October 2007, when the IACR was the only sanction at issue.[35] But in October 2007 and again in February 2012, the legal landscape changed. As the Court discussed above, the Cubic Judgment bears the current status as a "blocked asset" by operation of laws other than the IACR.

### c. The Nine Rubin Claimants May Rely on TRIA

 MOD argues that the Rubin Claimants cannot rely on TRIA to attach the Cubic Judgment because the repeal of § 1605(a)(7) makes TRIA inapplicable to subsequently entered terrorism-related judgments. MOD's complicated theory relies on the fact that the Rubin Claimants filed their complaint in 2001 and secured their judgment against Iran in 2003. During that time period, FSIA allowed lawsuits against state sponsors of terrorism under § 1605(a)(7). The Rubin Claimants filed their original lien on the Cubic Judgment in 2003 and cited § 1605(a)(7). Doc. No. 130. But in 2008, Congress repealed that subsection governing jurisdictional immunity and replaced it with § 1605A. *See supra* pages 1076–77 & 1082 (citing legislation). As soon as Congress amended FSIA in 2008, the Rubin Claimants obtained permission from the District of Columbia District Court to give their action the same effect as if it had been filed

---

**35.** The Court expresses no opinion on the Lien Claimants' assertion that the Cubic Judgment is blocked under other Executive orders that predate President Obama's action in February 2012. Jt. Motion Br. at 6 n. 5.

under the new terrorism exception, § 1605A. *See supra* pages 1076–77. MOD argues that § 1605A also requires judgment creditors of a foreign state to follow the attachment procedures in § 1610(a)(7).[36] In 2009, the Rubin Claimants amended their notice of lien on the Cubic Judgment. Because the 2009 lien is subsequent to the 2008 amendment, MOD argues TRIA does not apply to the Rubin Claimants.

As a matter of statutory interpretation, MOD's premise is unwarranted. The Court concludes that Congress' clear and consistent intent in amending FSIA in recent years, and in particular enacting § 1605A as well as TRIA, has been to assist victims collect compensation from foreign states that sponsored acts of terrorism. *E.g., Heiser,* 807 F.Supp.2d at 12–16, 18–19, 25–26 (surveying "the latest in series of attempts by Congress to aid these victims" of state-sponsored terrorism to enforce judgments). The language of § 1605A clearly states that victims have the right to benefit from treating their claim "as if" it had been filed under the new jurisdictional immunity exception for terrorism. Moreover, Congress specified that it applied to actions pending "in any form" and that "[t]he defenses of res judicata, collateral estoppel, and limitation period are waived." Pub. L. No. 110–181,

§ 1083(C)(2)(A) & (B), 122 Stat. 3 (2008). Congress wanted to help victims with pending actions, not create a hurdle for those who had secured money damages. The Court is not persuaded by MOD's argument that the 2008 amendment of FSIA restricted the ability of victims attach the assets of foreign states.

This conclusion is validated by the 2012 amendment to TRIA. Congress updated TRIA to reflect the new terrorism cause of action in § 1605A. Pub. L. No. 112–158, tit. V, § 502(e)(2), 126 Stat. 1260 (Aug. 10, 2012). TRIA now refers to both judgments "under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008)." 28 U.S.C. § 1610 note (2013). This amendment demonstrates that TRIA's attachment remedy is available to those who hold judgments "based upon" acts of terrorism, for which FSIA statute withholds jurisdictional immunity from designated state sponsor of terrorism. The Rubin Claimants satisfy that requirement. *Campuzano,* 281 F.Supp.2d at 261–62, 269–71; *see supra* pages 1076–77.

Even if the Court were to accept MOD's contention that the 2008 amendment does not apply to a "subsequently" entered judgment, the District of Columbia District Court did not enter a new judgment. The Rubin Claimants' judgment was entered in

---

**36.** MOD's brief incorrectly paraphrases § 1605A as if it were limited to the attachment provisions of "section 1610(a)(7) and (b)(2)" governing commercial property. MOD's Opp. Br. at 18. The actual language of the statute is not limited to those subsections, but instead refers to § 1610 in its entirety. 28 U.S.C. § 1605A(g)(1)(A).

Also, MOD's brief confuses citations to § 1610(g) with § 1605A(g). MOD's Opp. Br. at 18–19. MOD quotes, and its argument relies upon, the language of § 1605A(g). *Id.* at 18. Section 1605A concerns the terrorism exception to jurisdictional immunity. One of the improvements Congress made in 2008 was to create an automatic lien of lis pendens

upon any property that was subject to attachment under § 1610, which sets out the exceptions to attachment immunity. § 1605A(g); Elsea, *supra,* at 39–41, 99–100. Before that amendment, FSIA permitted prejudgment attachment of property used for commercial activities. § 1610(d). The lis pendens provision does not apply to this motion. The Court discusses attachment under § 1610(g) below.

In this same section of its brief, MOD further argues that the property available for attachment in § 1610(g) is limited to property used for a "commercial activity" as defined in § 1610(a). MOD's Opp. Br. at 17–19. The Court addresses this separate argument below. *See infra* pages 1094–96.

2003. A new judgment was not prepared when the District Court granted the motion to transform the Rubins' lawsuit against Iran as permitted by Congress. *See supra* pages 1076–77; Doc. No. 145, Ex. A.

### C. *FSIA § 1610(g) Authorizes the Rubin Claimants to Attach the Cubic Judgment*

■ As an alternative to TRIA, Lien Claimants argue that 28 U.S.C. § 1610(g) allows terrorism victims to attach "the property of a foreign state" without any requirement that the asset be "blocked."

MOD argues subsection § 1610(g) is not available because the property must have been used in connection with "commercial activity." MOD notes that the Ninth Circuit held in a prior appeal that MOD has not "used" the Cubic Judgment for a commercial purpose. *MOD*, 495 F.3d at 1036–37; *see supra* footnote 18. In addition, MOD contends that the Supreme Court ruled that the commercial activity exception does "not apply to property of an entity that itself is an inseparable part of the foreign state." *Elahi*, 556 U.S. at 374, 129 S.Ct. 1732 (citing *MOD*, 495 F.3d at 1035–36). Only a foreign state can buy military equipment to defend the nation, thus MOD contends that it entered into the Cubic contracts to perform a classic government function.

Lien Claimants contend that MOD misreads the scope of that decision. The Court agrees that MOD's contention is over broad in some respects. None of the prior decisions "declared that the Cubic Judgment is *not* subject to attachment under the immunity exemption of § 1610" *as a whole*. *See* MOD's Opp. Br. at 19. The Supreme Court was referring to § 1610(b)(7)—the commercial property exception to attachment of an agency's or instrumentality's assets. The Supreme Court held that Ninth Circuit erred in its

2004 decision by assuming that MOD qualified as an agency or instrumentality. On remand, in 2007, the Ninth Circuit held that MOD did not fit that category, but instead was entitled to the immunity afforded the foreign state itself. Thereafter, the Ninth Circuit held that the Cubic Judgment was not attachable under § 1610(a)(7)—the commercial activity exception that governs foreign states and political subdivisions—because MOD had not "used" the asset in that context. *See supra* footnote 18. The instant motion does not rely on the subsections addressed in those prior appeals. Instead, Lien Claimant's base this motion on § 1610(g). Because this section was added to FSIA in 2008, it was not at issue in the prior appeals. Pub. L. 110–181, div. A, tit. X, § 1083(b)(3), 122 Stat. 3 (Jan. 28, 2008).

Nonetheless, this argument raises the question of whether or not § 1610(g) is restricted to property that a foreign state has used in connection with commercial activity. MOD's argument presupposes that § 1610(g) covers only commercial property. Lien Claimants read the statute to separate § 1610(g) from any commercial activity requirement. By its own terms, § 1610(g) eschews any "commercial" use test by permitting attachment regardless of where the profits go or whether the government controls the property. § 1610(g)(1)(A)-(E) (listing five factors that do not prevent attachment).

The Court agrees with Lien Claimants that § 1610(g) "*expanded* the category of foreign sovereign property that can be attached; judgment creditors can now reach *any U.S. property* in which Iran has *any interest.*" *Peterson*, 627 F.3d at 1123 n. 2 (emphasis added); Elsea, *supra*, at 41–44, 100–01. The plain language of the statute supports a broad reading. Section 1610(g) allows attachment of any "property of a foreign state against which a judgment is

entered under section 1605A." [37] Congress did not qualify the definition by limiting it to property connected to a commercial activity. *Heiser*, 807 F.Supp.2d at 19 n. 8 (in dicta, stating "§ 1610(g) does not limit attachment to property used in 'commercial activity'—unlike the execution provisions found in § 1610(a) & (b)—and thus the Act 'removes from the victims the burden of specifying commercial targets … to help them receive justice and recover damages'") (quoting Debra M. Strauss, *Reaching Out to the International Community: Civil Lawsuits as the Common Ground in the Battle against Terrorism*, 19 Duke J. Comp. & Int'l L. 307, 332–33 (2009)).

If Congress had intended the commercial activity restriction to apply then it could have included the new language under a subsection to § 1610(a). Section 1610(a) covers property "used" by a foreign state "for a commercial activity" in seven situations. § 1610(a)(1) to (a)(7). But Congress did not insert the new attachment provision under the subheading of the commercial activity exception (*i.e.*, as § 1610(a)(8)). The plain text and placement of the new attachment provision shows that it is not limited to "commercial" property.

Similarly, subsection 1610(b), governing the property of an agency or instrumentality "engaged in commercial activity," and subsection 1610(d), governing lis pendens of property "used for a commercial activity," are specifically limited to assets connected to commercial activity. Congress knew how to specify when commercial assets were vulnerable to attachment.

██ The historical context is also important. A significant roadblock exists because few Iranian assets remain in the United States given severed economic and diplomatic ties. *Heiser*, 885 F.Supp.2d at 441; *Heiser*, 807 F.Supp.2d at 14. That fact impairs the ability of terrorism victims to obtain justice. Congress added § 1610(g), like FSIA § 1610(f) and TRIA, specifically to assist victims of terrorism who had been thwarted in their attempts to find assets to satisfy their judgments. *E.g.*, *Heiser*, 807 F.Supp.2d at 13–16 (reviewing the "desolate backdrop" of barriers facing victims before Congress enacted § 1610(g) in 2008); Elsea, *supra*, at 6–18, 51, 98–99. Notably, all of these subsections only apply to the rare countries that have been designated as state sponsors of terrorism. *E.g.*, 31 C.F.R. § 596.201 (designating Iran and three other countries). By comparison, the commercial activity exceptions in § 1610(a) and (b) apply to *every* country, thereby providing greater protection to property owned by friendly governments than by hostile governments. *See Peterson*, 627 F.3d at 1127–28. Congress has the power to withhold the privi-

---

**37.** The current statute reads as follows:

 (g) Property in certain actions.—

 (1) In general.—Subject to paragraph (3) [regarding innocent third-party owners], the property of a fore state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state including property that is a separate juridical entity or is an interest Meld directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section regardless of—

 (A) the level of economic control over the property by the government of the foreign state;
 (B) whether the profits of the property go to that government;
 (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
 (D) whether that government is the sole beneficiary in interest of the property; or
 (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.
28 U.S.C. § 1610(g) (2013).

lege of jurisdictional immunity from foreign states that sponsor terrorist acts and to treat their property differently. *Elahi,* 124 F.Supp.2d at 106 (citation omitted); *Heiser,* 885 F.Supp.2d at 444 ("the 'property of' of designated state-sponsor of terror loses its sovereign immunity and may become subject to attachment"). In an attempt to help such victims obtain compensation, Congress sensibly expanded the universe of assets that could be attached to "any property interest in which the foreign state enjoys a beneficial ownership." H. Rep. No. 110–447 (Dec. 6, 2007); ·*Peterson,* 627 F.3d at 1123 n. 2; *Calderon–Cardona,* 723 F.Supp.2d at 458.

In light of the plain language of § 1610(g), the Court finds that the Cubic Judgment is "property" that can be attached by the Rubin Lien Claimants, as holders of judgments under § 1605A based upon Iran's sponsorship of terrorist activities.

■■■ This particular holding applies only to the Rubin Claimants. When Congress added § 1610(g) in 2008, it limited the broad attachment exception to suits under § 1605A. As described, the Rubin Claimants' lawsuit was pending at the time Congress enacted § 1605A. *See supra* pages 1076–77. The District of Columbia District Court gave their judgment the same effect as if it had been entered under § 1605A. Thus, the Rubin Claimants can rely on § 1610(g). Because Rafii's lawsuit was brought under the now-repealed terrorism exception, § 1605(a)(7), she is not eligible to invoke § 1610(g). *Peterson,* 627 F.3d at 1123 n. 2 ("Plaintiffs in this case failed to re-file their actions under the new § 1605A terrorism exception and cannot take advantage of new § 1610(g).") (citation omitted); *Heiser,* 807 F.Supp.2d at 18

n. 5 ("the benefits provided [by § 1610(g) ] accrue only to victims of state-sponsored terrorism who obtained judgments under § 1605A, and not its predecessor, § 1605(a)(7)") (citation omitted); *Bennett,* 604 F.Supp.2d at 162 (Section "1610(g), by its express terms, applies only to 'judgments entered under 1605A,' and thus this new provision is not available to plaintiffs, like the Bennetts in this action, who have judgments under § 1605(a)(7)"). Moreover, when Congress amended FSIA in August 2012, it often extended attachment relief to judgments entered under the old § 1605(a)(7) as well as the current § 1605A. *E.g.,* § 1610(a)(7), (b)(3); Pub. L. 112–158, tit. V, § 502(e)(1), 126 Stat. 1214 (Aug. 10, 2012). It did not make that change to § 1610(g). Therefore, the Court holds that Rafii cannot rely on § 1610(g) to attach the Cubic Judgment.

### D. *California's Attachment Procedure*

Though the gravamen of the instant motion is attachment under California law, the issue warrants only brief discussion. MOD does not object to the procedure used by the Lien Claimants' to attach the Cubic Judgment.

State law applies to motions to attach a money judgment issued by a federal court. Fed.R.Civ.P. 69(a)(1); *Peterson,* 627 F.3d at 1130 (citations omitted); *Hausler v. J.P.Morgan Chase Bank, N.A.,* 845 F.Supp.2d 553, 563 (S.D.N.Y.2012) (citing legislative history that "Congress contemplated the use of state procedural law to enforce judgments" while federal law provides substantive rules of TRIA).

■■■ California's procedure to satisfy a lien is set forth in § 708.470 of the Code of Civil Procedure.[38] The claimant bears the

---

**38.** That statute states:

If the judgment debtor is entitled to money or property under the judgment in the action or special proceeding and a lien cre-

ated under this article exists, upon application of any party to the action or special proceeding, the court may order that the judgment debtor's rights to money or prop-

burden of proof and the Court has discretion whether to grant the application. *Brown v. Super. Ct.,* 116 Cal.App.4th 320, 9 Cal.Rptr.3d 912, 924 (2004). "To obtain a lien under this article, the judgment creditor shall file a notice of lien and an abstract or certified copy of the judgment creditor's money judgment in the pending action or special proceeding." Cal.Civ. Proc.Code § 708.410(2)(b) (West 2012).

 The Court has independently reviewed the documents and has only one concern. California follows the "first in time, first in right" rule "according to the time of their creation," that is, on the date of filing a notice of lien. Cal. Civ.Code § 2897 (West 2012); *Fleet Credit Corp. v. TML Bus Sales, Inc.,* 65 F.3d 119, 122 (9th Cir.1995); *First Bank v. East West Bank,* 199 Cal.App.4th 1309, 132 Cal.Rptr.3d 267, 270 (2011); *Oldham v. Calif. Capital Fund, Inc.,* 109 Cal.App.4th 421, 134 Cal. Rptr.2d 744, 751 (2003) (notice of lien establishes and preserves creditor's priority); *Brown,* 9 Cal.Rptr.3d at 918. Rafii holds the senior lien (filed on May 16, 2003). The Rubin Claimants filed their notice five months later (October 30, 2003, as amended on April 29, 2009).

The Rafii and Rubin Lien Claimants filed a joint motion and have agreed between themselves how to allocate the proceeds of the Cubic Judgment. They request that the funds be deposited to a bank account designated by their attorneys so as to relieve the Court of any obligation to apportion the funds between claimants.

This request is inconsistent with Rafii's senior lien. She is entitled to satisfy her judgment in full and has no obligation in law or fact to share the Cubic Judgment with junior creditors.[39] Equally important, each of nine Rubin Claimants must understand the operation of the apportionment agreement to their compensation awards. *See supra* page 1076 (Noam Rozenman recovered $15 million, while Deborah Rubin's damage award totaled $2.5 million).

Accordingly, the Court orders each Lien Claimant to submit an individual, notarized statement consenting to the apportionment of the Cubic Judgment between and among them as negotiated by their attorneys. *Collins v. Home Sav. & Loan Ass'n,* 205 Cal.App.2d 86, 22 Cal.Rptr. 817, 822 (1962) (a party may waive or subordinate her priority); *Irvine v. Calif. Cotton Credit Corp.,* 18 Cal.App.2d 761, 64 P.2d 782, 782–83 (1937). The affidavit must contain a clear and concise explanation of the terms of the apportionment agreement and the statutory right of priority. The information must be written in plain, easily understood language so as to reflect that each Lien Claimant is making a knowing, voluntary, and intelligent decision. The affidavits shall be submitted to the Court within 45 days from the date of the filing of this Order, and in counsel's discretion, may be accompanied by a motion to file the notarized statements under seal.

As a housekeeping note, counsel shall also provide the federal taxpayer identifi-

---

erty under the judgment be applied to the satisfaction of the lien created under this article as ordered by the court. Application for an order under this section shall be on noticed motion. The notice of motion shall be served on all other parties. Service shall be made personally or by mail. Cal.Civ.Proc.Code § 708.470 (West 2012).

**39.** The record indicates that the Lien Claimants seek postjudgement interest on their de-

fault judgments. *E.g.,* Pls.' Motion at 2 *Rubin,* Case No. 01–CV–1655–RMU (D.D.C. filed Mar. 28, 2008), ECF 76. A simple calculation shows that interest at the federal rate on Rafii's ten-year old judgment could exhaust the entire $9.4 million on deposit before the Rubin Claimants collect any of those funds. 28 U.S.C. § 1961.

cation number as required by Local Rule 67.1.

### E. *Stay*

MOD requests a stay of execution of the liens to allow it time to appeal. Fed. R.Civ.P. 62.

Lien Claimants oppose a stay on the grounds that the case presents no extraordinary circumstance; MOD's arguments lack merit; and ten years have passed since the victims secured their judgments against Iran.

The Court prefers a two-step process that immediately provides for execution on the attachment and forthwith transfers title to the Lien Claimants, but stays disbursement of the funds until the conclusion of any appeal.

The docket shows that no other claimant has a senior lien.

The Court instructs the Clerk of the Court to reflect the name on the account in this action so that the owners are France M. Rafii, Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersh, Renay Frym, Noam Rozenman, Elana Rozenman, and Tzvi Rozenman. The allocation of the funds between the several claimants will be set forth in a future Order.

The Court concludes that it is appropriate to stay the *disbursement* of funds pending appeal. *Haw. Hous. Auth. v. Midkiff,* 463 U.S. 1323, 104 S.Ct. 7, 77 L.Ed.2d 1426 (1983); *Klaus v. Hi–Shear Corp.,* 528 F.2d 225 (9th Cir.1975) (purpose of stay is to preserve status quo); *Marisco, Ltd. v. F/V Madee,* 631 F.Supp.2d 1320 (D.Haw.2009) (applying Rule 62 standard to request to stay enforcement of a money judgment). These are complex and important legal issues. The United States' relationship with Iran is constantly changing, and the United States may alter the sanctions in response. The funds have been deposited with the Court and this eliminates any risk that the funds will not be available to the prevailing party. *See Colo. River Indian Tribes v. Town of Parker,* 776 F.2d 846, 850–51 (9th Cir.1985). If MOD prevails on appeal, however, it may be difficult to retrieve the funds from Lien Claimants. *Lamon v. Shawnee, Kan.,* 758 F.Supp. 654 (D.Kan.1991); Order *Rubin,* No. 01–CV–1655–RMU (D.D.C. filed May 26, 2005) (granting stay on execution of bank funds since it would be difficult to get money back from plaintiffs). That situation could have diplomatic implications on the pending negotiations between the United States and Iran.

On balance, these factors persuade the Court to transfer title but stay *disbursement* of the funds until the completion of the appeal.

The Court finds that a bond is unnecessary given the safety of the Court's registry account. Fed.R.Civ.P. 62(d).

In the event that MOD does not file a timely appeal, Lien Claimants may return to the Court to request the release of the funds.

### *CONCLUSION*

Upon due consideration of the parties' memoranda and exhibits, the arguments advanced at hearing, and for the reasons set forth above, the Court hereby grants Lien Claimants' joint motion to attach and execute on the Cubic Judgment. [# 222].

Within 45 days, Lien Claimants shall submit the affidavits described above.

The Lien Claimants' judgments shall attach the proceeds of the Cubic Judgment. Execution on that Cubic Judgment to partially satisfy the judgments of the Lien Claimants shall be deemed to have been accomplished. Title to the proceeds is deemed vested in the Lien Claimants. The Clerk of the Court shall reflect the

name on the account in this action so that the owners are France M. Rafii, Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersh, Renay Frym, Noam Rozenman, Elana Rozenman, and Tzvi Rozenman. *The Clerk shall not disburse any funds until further Order of this Court.*

IT IS SO ORDERED.